FRANK KULBACKI, ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF FRANCIS KULBACKI, DECEASED, PLAINTIFF-RESPONDENT, v. RICHARD SOBCHINSKY AND MARTIN GUZIOR, T/A THE SOMERVILLE TRANSFER COMPANY, DEFENDANTS-APPELLANTS.

Argued September 10, 1962—Decided November 19, 1962.

438

*Mr. H. Curtis Meanor* argued the cause for defendants-appellants (*Messrs. Lamb, Langan & Blake,* attorneys; *Messrs. Arthur J. Blake* and *H. Curtis Meanor,* of counsel).

*Mr. Seymour Feingold* argued the cause for plaintiff-respondent (*Mr. Samuel Kaplan,* attorney; *Mr. Feingold,* of counsel).

The opinion of the court was delivered by

SCHETTINO, J. This is a Death By Wrongful Act suit (*N. J. S.* 2A:31–1 *et seq.*) in which plaintiff sought damages for the death of his eight-year-old boy. It was tried before a jury which returned a unanimous verdict in favor of defendants. When the trial court subsequently denied plaintiff's motion for a new trial, an appeal was taken. The trial court's denial was reversed by the Appellate Division and a new trial

ordered. The Appellate Division stated that it was satisfied that the verdict "was the product of mistake or ignorance and that it was contrary to the weight of the evidence." Defendants' application for certification was granted by this court. 37 *N. J.* 89 (1962).

Defendants contend that the Appellate Division (a) did not apply the correct test of appellate review of a trial court's refusal to order a new trial after a jury verdict; (b) erred in its analysis of the testimony; and (c) thus arrived at a wrong conclusion that the verdict was against the weight of the evidence and was the product of mistake or ignorance.

The truck-pedestrian accident causing the death took place on June 13, 1958 at about 3 P. M. at the intersection of State and Washington Streets, Perth Amboy, in or close to the crosswalk running between the southeast and northeast corners. The streets intersect at right angles with centerlines running east and west on Washington Street and north and south on State Street. Both streets are 39 feet 8 inches wide. The crosswalks connecting the corners are lined, the inside crosswalk lines painted about six inches in from each corner and the parallel lines six feet distant. Traffic at the intersection is controlled by one light which is suspended over the intersection from a pole located at the northeast corner.

Immediately before the accident, the witnesses and parties involved in this tragedy were located as follows. The boy, Francis, was on the southeast corner waiting for a red light to change to green so that he could go north on State Street. Mr. Sobchinsky, the defendant driver of defendant Guzior's truck, was at the northwest corner facing south on State Street, waiting for the same red signal to change to green whereupon he intended to go forward and make a left turn into Washington Street. His truck was 25 feet, four inches long and about 13 feet wide, with sides extending six to eight inches over the chassis. Mrs. Duchak, a school crossing guard, was stationed on the same northwest corner to Mr. Sobchinsky's right. Mr. McSpiritt, another witness, had been driving west on Washington Street and shortly before

the moment of the accident was stopped some six feet from the most easterly crosswalk line of the southeast to northeast crosswalk and two feet to the north of the Washington Street centerline. To his right was a parked car. Mr. Fricker, still another witness, was in the entrance to his home on Washington Street located some 45 feet east of the southeast corner of the intersection.

Mrs. Duchak, called by plaintiff, testified that it was raining lightly and the amount of traffic at the intersection was normal, that the boy was walking north on the east side of State Street and stopped to wait a change in the traffic signal when he reached the intersection, that when the light changed to green, she signaled him to cross the street and she saw him walk within the pedestrian crosswalk halfway across Washington Street before she turned her attention to other school children coming from another direction. On several occasions during direct and cross examination, Mrs. Duchak reasserted that she saw the boy go halfway across Washington Street.

Mrs. Duchak further testified that when she first saw defendants' truck, it was standing still, waiting for the signal light to change, that it did not move until the light changed to green and that when the truck began its left turn, it was moving very slowly. She said that from the position in which she was stationed, defendants' truck did not bar her view of the boy so that she was able to see the youngster reach a point halfway across Washington Street. Mrs. Duchak conceded that, in the process of turning, the truck would have blocked her view of the boy if it had started up before the boy had completely crossed the southern half of the Washington Street crosswalk.

Mr. Fricker, also called by plaintiff, stated that, when he first saw the decedent, the boy was on the left-hand side of the truck not quite halfway across the Washington Street crosswalk and that the boy was facing south. He saw the front part of the body of the truck behind the driver's cab come into contact with the boy and at that moment, the front

part of the truck was into Washington Street. He then jumped up, shouted to Sobchinsky to stop, and saw the truck stop immediately. After the accident, he saw the decedent lying south of the center line of Washington Street. Under repeated examination, he insisted that when he first saw the boy, the boy was facing south. In summation, plaintiff's counsel referred to him as "an honest witness." The Appellate Division characterized Fricker's testimony as "vague and confusing."

Mr. McSpiritt, testifying for plaintiff, stated that when he first saw the decedent, the boy was near the southerly curb of Washington Street at the southeast corner, but that he did not keep a constant watch on the youngster from the time the boy left the southerly curb of Washington Street up to the point of the accident. Mr. McSpiritt was unsure whether the decedent, while walking, maintained a steady pace, slowed down or speeded up. He did not see the boy turn his head and look to the south but did see him look to the east (to the boy's right). He said that the first time that he noticed the truck was when the truck was in the process of making a left-hand turn, and that the speed of the truck was possibly one to two miles an hour and clearly less than five miles an hour. Mr. McSpiritt stated that the initial point of contact between the decedent and the truck was on the left side of the truck at the point where the front fender joins the running board and that the decedent was more than one-third of the way across the street at that time.

A lieutenant detective of the Perth Amboy Police Department, called by plaintiff, said that he arrived at the scene of the accident at about 3:10 P. M. and interrogated Sobchinsky. When asked what Mr. Sobchinsky had told him, the police officer said:

"He stated to me that he had been traveling south on State Street, in answer to my question as to the direction he was traveling prior to the accident. He said he had been traveling south on State Street, and that on the green light he made a turn east into Washington Street; that as he entered Washington Street, someone hollered,

'Stop!' He immediately applied the brakes and someone hollered, 'Back up. There's a child under the wheels.' He stated that he then put the truck in reverse and backed up two feet. He then also stated to me that he did not see the boy he hit until after the accident when he viewed him under the truck."

The policeman gave the above referred to dimensions of the truck and, additionally, described the truck as having two front wheels and a pair of dual rear wheels. He said that when he arrived at the scene, the left rear wheels of the truck were about two feet south of the center line of Washington Street and that the right rear corner of the truck was about five feet from the most easterly pedestrian crosswalk line on Washington Street. He also saw nine feet two inches of skid marks on the pavement beginning at a point just east of the crosswalk and leading to a point approximately two feet to the east of the left rear dual wheels.

His examination of the truck revealed no evidence of any contact between the decedent and the front of the truck, but he did notice an indication of such contact at a point approximately six feet ahead of the left rear wheels on the underside of the truck chassis.

Defendant Sobchinsky testified that he was on his way to make a delivery and that he was traveling south on State Street. When he arrived at the intersection of State and Washington Streets, he stopped for a red light. He saw two cars facing north on State Street which had also stopped for the same light, and when the light changed to green, defendant started forward for a distance and then stopped to permit the two north bound cars to go by. He then made a left turn at a speed of two to four miles per hour and was proceeding to go straight when somebody yelled "Stop, stop." He stopped immediately and the man yelled "Back up." The defendant backed up a few feet, got out of the truck and saw the boy under the rear left wheels.

Because of its importance, we quote at length Mr. Sobchinsky's testimony on cross-examination concerning the observations he claimed he made.

"Q. You never saw Francis Kulbacki before you got out of the truck after you had stopped? A. No, sir.

Q. * * * as you made the left-hand turn onto Washington Street was there anything to obstruct your vision of the area of the sidewalk where the boy was crossing? A. No, sir, I don't believe there was.

Q. Did you look in that direction at all at any time while you made the turn? A. Yes, sir, I had to, to see if —

Q. Did you look, sir? A. Yes, sir.

Q. And you did not see the child? A. No, sir, I didn't.

*    *    *    *    *    *    *    *

Q. Where in relation to the southeast corner was your truck when you made your first observation of that corner? In other words, where were you in relation to the intersection and the curb at that corner? A. I was stopped at the light.

Q. At the point before you made the turn? A. Behind the crosswalk, sir.

*    *    *    *    *    *    *    *

Q. And while you were in that position did you look at the crosswalk? A. Yes, sir.

Q. Did you then move after you looked, sir? A. I moved after the light changed.

Q. After you started moving did you make any other observation of that area, the pedestrian crosswalk? A. No, sir.

Q. So after making the first observation you made no further one? A. As I was making the turn, yes, sir, I did.

Q. You made another observation? A. Well, I would have to to make the turn.

Q. Well, did you? A. Yes.

Q. And then you started moving? A. Yes, sir.

Q. Now, after you started to move did you make any observation? A. I stopped for the traffic, and then I checked to see if there were any cars coming up, and then I made my turn.

Q. So, in other words, you made these two observations as you described while you were sitting there waiting for traffic to proceed past you on State Street, is that correct? A. Yes, sir.

Q. And thereafter you made no further observation after you started moving? A. No, sir."

In its charge, the court suggested to the jury that it first take up the problem of the defendant's negligence so that if it found Richard Sobchinsky not negligent, it need go no further. The jury retired at 3 P. M. to deliberate and returned at 4 P. M. with this question: "In the event that either party is not negligent, can the parents be compensated in any way?" The court then charged the jury that if it found an

absence of negligence on the part of both parties, there could be no recovery. The trial court gave the litigants an opportunity to object to this supplemental charge. Defendant's attorney said that he had no objection and plaintiff's attorney said nothing. The jury returned to the jury room at 4:05 P. M. and returned at 4:15 P. M. with an unanimous verdict as stated by its foreman: "No charge. The driver is not guilty." The court then stated: "Then it is your verdict that you find in favor of the defendants of no cause of action?" The jury was polled and all jurors agreed.

Thereafter, plaintiff's motion for a new trial was denied.

I.

We first consider the duty imposed upon a trial court when a motion for a new trial is made after a jury verdict. The rule has been stated in *Hager v. Weber,* 7 *N. J.* 201, 210 (1951), that not only is the appellate tribunal forbidden to invade the constitutional office of the jury by weighing the evidence where it is fairly susceptible of divergent inferences and substituting its own judgment, but also "this conception of the weight of the evidence governs the trial court as well * * *."

It is common knowledge that persons of equal intelligence, sincerity and impartiality frequently draw wholly different inferences from identical facts. But it is the exclusive privilege and function of the jury to draw the inferences in the first instance. One juror may believe the inferences to be drawn from identical facts disclose negligence. Another may believe precisely the opposite. The law commits the decision to the entire jury. It is the province and duty of the jurors to discuss the inferences which properly should be drawn from testimony, to resolve those inferences and, if possible, to reach a decision thereon. Once the jury has reached its decision, the trial judge, upon considering a motion for a new trial, cannot then step in, weigh the evidence to determine what conclusion he would have come to and

grant a new trial simply because his conclusion would have been contrary to the jury verdict.

■ What the trial judge must do is canvass the record, not to balance the persuasiveness of the evidence on one side as against the other, but to determine whether reasonable minds might accept the evidence as adequate to support the jury verdict—or in the language of *Hager*, to determine "if the verdict be so far contrary to the weight of the evidence as to give rise to the inescapable conclusion of mistake, passion, prejudice, or partiality" so that "it cannot serve to support the judgment, * * *." (7 *N. J.*, at *p.* 210). If reasonable minds might accept the evidence as adequate to support the jury verdict, it cannot be disturbed by the trial court.

■ In denying the motion for a new trial, the trial judge gave his understanding of his obligation in passing on the motion. At the outset he stated that he had reviewed his notes and the facts in the case and that while his sympathies were with the parents of the child, he would not allow his sympathies to transcend the law as he found it. Turning his attention to the statement of facts urged upon the court by opposing counsel, the trial judge found that they served to emphasize the conflicting questions requiring resolution by a jury. He then noted that while he personally might have decided the case another way if he had been on the jury, he could not substitute his judgment "where there is no evidence that the jury was so greatly mistaken in its conclusions as to shock the conscience of the Court." The trial judge then set out the heart of his reasoning in denying the motion:

"In order to disturb the findings of the jury on the issue of liability it must clearly and convincingly be established that the verdict of the jury inevitably gives rise to the inescapable conclusion that it was the result of mistake, passion, partiality, or prejudice, and by that standard to be palpably against the weight of the evidence.

Jurors compose the appropriate tribunal for the determination of controverted questions of fact. The Court is not permitted to weigh the evidence. I cannot consider in my mind the weight of the testimony of the defendant driver. That was for the jury to do. The trial court on a motion such as this cannot invade the constitutional

office of the jury, and may not weigh the evidence where it is fairly susceptible of divergent inferences, and substitute its own judgment for that of the jury."

The clear import of the trial judge's comments here is that he evaluated the evidence and found it *"fairly* susceptible of divergent inferences" so that the jury could have reasonably come to the conclusion it did. He then felt compelled not to disturb the jury verdict.

We find the trial court properly applied the correct principles on this motion for a new trial.

## II.

We next consider the scope of review on an appeal from an order denying a new trial. While the *Hager* rule is stated in terms equally applicable to trial and appellate courts, the authority of the appellate court in reviewing the order of a trial judge in granting or denying a motion for a new trial is in fact more limited. In *Hartpence v. Grouleff,* 15 *N. J.* 545 (1954), we pointed out that the action of the trial court is entitled to great weight where the verdict is assailed as being against the weight of the evidence for (at *p.* 549) :

"A trial judge is in a better position than an appellate court to decide whether justice has been done under the particular circumstances and the weight of the credible evidence. He sees and hears the witnesses, observes their demeanor and reactions, none of which has life in the record on appeal. He is in a position to know and equate all the factors, including any error he may have made, and establish a basis which leads to the conclusion that the verdict was the result of passion, mistake or prejudice. His action should not be disturbed unless it clearly and unequivocally appears there was a manifest denial of justice under the law."

As Mr. Justice Jackson observed in *Ashcraft v. Tennessee,* 322 *U. S.* 143, 171, 64 *S. Ct.* 921, 88 *L. Ed.* 1192, 1208 (1944), "a few minutes' observation of the parties in the courtroom is more informing than reams of cold record."

We note several decisions subsequent to *Hartpence* which adhere to its rationale. In *Honey v. Brown,* 22 *N. J.* 433 (1956), plaintiff brought suit for personal injuries arising out of an automobile accident which occurred one dark foggy night when her car struck a trailer parked on the shoulder of a highway as she pulled off the road to stop until fog lifted. Defendants' negligence turned on the sole question of whether the rear lights of the trailer were on at the exact moment of the collision. Plaintiff testified that she did not see what looked like a wall until a split second before the accident or any lights on the "wall." The driver testified that he checked the rear lights immediately before the accident and they were lighted. Four other witnesses testified that the lights were on 15 minutes or more after the accident, and one of them saw the truck three and a half hours earlier, at which time all lights were on. Mrs. Barna, the wife of the owner of a diner across the highway, looked out her window as soon as she heard the crash and saw nothing, but it was foggy. She looked out another window a few minutes later and saw that all the truck lights were lighted. The jury returned a verdict for plaintiff and a motion for a new trial was made on the ground that the verdict was against the weight of the evidence and the result of mistake or passion. The motion was denied and the Appellate Division affirmed. On appeal to this court, we held that the inferences to be drawn from the conflicting testimony of plaintiff, Mrs. Barna and the other witnesses and the weight to be accorded to such testimony were matters for the jury, and its verdict should not be disturbed, citing *Hartpence, supra.*

*Schisano v. Brickseal Refractory Co.,* 62 *N. J. Super.* 269 (*App. Div.* 1960), affirmed on the majority opinion below, 33 *N. J.* 323 (1960), arose out of a dispute between plaintiff's decedent and defendant's employee when the former parked his car in a private parking lot. One of the duties of this employee was to keep the lot clear of vehicles that had no right to park there. Decedent became excited and came over a snowbank toward the employee with arms raised over

his head and his fists clenched. As he reached the employee, the latter struck him on the jaw and knocked him down. The only witness to the altercation, an officer of defendant, was unable to say whether decedent's arms had moved toward the employee before the blow was struck. Decedent died the next morning of a heart attack and his widow filed suit against the employer, charging that the employee, who had also died before suit was instituted, was acting within the scope of his employment and had wrongfully struck her husband and caused his death. The jury returned a verdict for plaintiff and the trial court refused to set aside the verdict as contrary to the weight of the evidence and to grant a new trial. On appeal, defendant argued that the trial judge should have ruled as a matter of law that the employee acted in justifiable self-defense and that the dispute was personal and unrelated to the employment. The Appellate Division noted that, while the only eyewitness testified that the decedent was on his way to fight with the employee, the jury might have concluded that the latter should have waited to see if the decedent was actually going to strike him or attempt to push him off or that the employee was not acting in self-defense at all. And when defendant contended that, nevertheless, the trial judge erred in not granting a new trial, the court recognized "the trial judge's superior opportunity to weigh the evidence and determine whether or not justice has been done under the particular circumstances" and found that it could not say that the refusal to grant a new trial was a manifest denial of justice. 62 *N. J. Super.*, at *page* 276.

In *Roether v. Pearson,* 36 *N. J. Super.* 465 (*App. Div.* 1955), a two-car intersection accident occurred as plaintiff was making a left-hand turn. There were conflicting versions of how the accident happened. There was evidence both of defendant's negligence and of plaintiff's contributory negligence. Plaintiff primarily relied on the fact that defendant had pleaded guilty to a criminal charge of drunken driving. The jury returned a verdict in defendant's favor and plaintiff's motion for a new trial was denied. The Appel-

late Division affirmed. In answer to plaintiff's contention that the jury should have held defendant responsible solely on the basis of his guilty plea, the court described such evidence as not conclusive of negligence, but something to be weighed and considered by the jury. It said (at *p.* 468) :

"We conclude that there was credible evidence in the record on which the jury could have returned the verdict it did. Certainly it does not clearly and convincingly appear that the verdict was the result of mistake, partiality, prejudice or passion, and unless it does, the verdict should stand. \* \* \*

The trial judge who heard the evidence first-hand and had an opportunity to observe the witnesses refused to disturb the jury's findings. \* \* \*"

Other cases indicate that there may be compelling reasons which would lead an appellate court to conclude that the trial court erred in granting or denying a new trial. In *Davis v. Hellwig,* 21 *N. J.* 412 (1956), plaintiff was struck by a ricocheting bullet fired at a fleeing thief by the defendant policeman. The accident occurred just before noon on a shopping day on a very narrow street in downtown Newark. Defendant conceded that he was aware that there would be shoppers on the street at that hour but, intent on stopping the thief, he admitted he did not look around him. The trial court refused to grant a new trial after the jury returned a verdict of no cause of action, and the Appellate Division reversed. 37 *N. J. Super.* 569 (1955). At the outset that court noted that the case lacked the characteristics commonly noticeable in negligence cases in that the factual circumstances were not in substantial dispute. *Thus, the credibility of witnesses posed no problem for the jury.* Believing the law to be that a policeman was not legally justified in discharging his gun at a fugitive petty thief, the court was unable to understand how the jury could conclude in the absence of mistake, sympathy, prejudice or partiality that "the defendant was not remiss in the observance of his precautious duty to exercise a degree of care commensurate with the reasonably foreseeable likelihood of endangering the safety of some pedestrian

such as the infant plaintiff." 37 *N. J. Super.*, at *page* 574. We disagreed with the premise that the defendant's act in shooting at the thief was without lawful justification. However, we refused to disturb the Appellate Division's conclusion that the trial court erred in denying a new trial because its refusal unequivocally appeared to be a manifest denial of justice under the existing law and undisputed facts. The *Hartpence* standard of appellate review was held equally applicable although defendant was justified in discharging his gun. As there is a strict rule of accountability for want of extraordinary care in the use of firearms and the defendant admitted he made no observance for pedestrians beyond seeing that there was none in the direct line of his fire, we concluded that his conduct so far departed from the applicable standard of care "as plainly to entitle the plaintiff to have her action considered by another jury under instructions consistent with this opinion." 21 *N. J.*, at *page* 421. Even under these circumstances, we refused to say "that defendant's liability was established by such direct and positive evidence that the issue whether plaintiff's injury was due to his negligence can be taken from the consideration of the jury and be pronounced upon as a matter of law." 21 *N. J.*, at *page* 420.

In *Dahle v. Goodheer,* 38 *N. J. Super.* 210 (*App. Div.* 1955), certification denied 20 *N. J.* 534 (1956), plaintiff-passenger was injured when the automobile driven by his future father-in-law, Goodheer, was struck in the rear by a Public Service bus. He sued Goodheer, Public Service and its driver. The evidence as to how the accident happened was in direct conflict. Plaintiff offered proof that Goodheer was traveling east in the fast or left hand lane of the highway, looking for a way to reverse his direction, and slowed down to make a left-hand turn through an opening in the safety island when the accident happened. Such a turn was forbidden at that point. In the pretrial order, both plaintiff and Goodheer contended that the car was turning or was in the opening. Goodheer produced no witnesses. The account

offered by Public Service was that Goodheer was traveling in the right-hand lane, cut in front of the bus and tried to pass through the opening, thus causing the accident. The jury returned a verdict in favor of Public Service and its driver and against Goodheer. Plaintiff moved for a new trial limited to damages against Goodheer. Goodheer then moved for a new trial on all issues and as to all parties. The trial court granted the latter motion. On appeal, the Appellate Division concluded that the trial court found the award so grossly inadequate as to cast doubt on the jury's findings as to liability. While recognizing that there is a suspicion of compromise when there is a close question of liability and the jury returns an inadequate award of damages, the appellate court found no close question of liability as between plaintiff and Goodheer. The only close question as to liability was whether the verdict should not have run against Public Service and its driver as well, but the court concluded that "There is no perceivable inferential relationship between the inadequacy of the award against Goodheer and the exculpation by the jury of the other two defendants on a factual case rendering that result in nowise capricious or suspicious." 38 *N. J. Super.*, at *pages* 219–220. As to the argument that *Hartpence* required that the order under appeal be affirmed, the court stated (at *pp.* 221–222) :

"Giving full consideration to the injunction set out in *Hartpence v. Grouleff*, we are of the opinion that it clearly and unequivocally appears that the action of the trial judge in granting a new trial as to all parties and all issues was a manifest denial of justice under the law. That action is not supportable on any rational view of the case, even in the light of his having seen and heard the witnesses.
\* \* \*
The new trial should have been limited to the question of damages as to defendant Goodheer only. The jury properly established his liability but went astray in awarding inadequate damages—this for the possible reason that damages were being assessed against infant plaintiff's father-in-law."

All these cases indicate that the *Hartpence* ruling calls for a great deal of restraint on the part of the Appellate Division and the Supreme Court in reviewing such an order of the

trial judge. "[The] appellate power is sharply circumscribed * * *." *Randazzo v. Bacque*, 37 *N. J. Super.* 548, 550 (*App. Div.* 1955). Appellate courts are not privileged to disturb the order "unless it clearly and unequivocally appears there was a manifest denial of justice under the law." Unless this exacting test was met here, a new trial was not in order.

## III.

In light of the foregoing, we must now evaluate the testimony to determine whether the Appellate Division was correct in its conclusion that the trial court's refusal to grant a new trial was "a manifest denial of justice under the law." We limit the analysis of the testimony to the finding by the jury that the defendant driver was not negligent. There is no need to discuss the boy's contributory negligence, for, the jury, consistent with the trial court's charge, never arrived at that issue. Quite properly the trial court charged the jury that it must first find defendant negligent before determining proximate cause, contributory negligence and damages, and that it need go no further if it found no negligence on the part of defendant. Here the jury followed the court's instructions with particularity. Its special question, after one hour of deliberation, asking whether it could compensate the parents if neither party was negligent indicates that the jury had tentatively found no negligence on the part of the defendant driver. Since its redeliberations lasted about ten minutes, its verdict was clearly one of no negligence by defendant driver.

We must decide whether there are facts, or permissible inferences from fact, which reasonable minds might accept as an adequate basis to support the jury's finding of no negligence. And this decision must be made by giving due regard to the finding of the trial judge to that effect. The theory of plaintiff's case is that defendant driver was negligent in that he should have seen the boy if he had made a proper observation and had been exercising reasonable care in making the turn. The theory of the defense is that the

defendant driver made a proper observation when he made his turn, and that the boy must have turned back and walked or run into the side of the truck. It is important to keep in mind that no witness observed the boy during the *entire* period from the moment he left the southeast corner until he came in contact with the truck. The matter of his course and the manner of the happening of the accident, therefore, had to be determined by the jury on inferences drawn by it from the testimony of the various witnesses. In so determining, it justifiably could choose not to believe all of the testimony of every witness.

██ If we take Mrs. Duchak's testimony as a beginning point, the boy was at least to the centerline of Washington Street and had less than 20 feet to go before reaching the northeast corner when she saw him last and before the truck started to move. At that moment, the defendant's truck was stopped on Washington Street 6½ feet short of the northwest corner of the intersection. When he started up, he went forward at least the 6½ feet plus some distance just less than 20 feet before stopping to let the two northbound cars pass through the intersection. Defendant and the boy were traversing their respective courses in opposite directions; the boy, northerly, and the driver, southerly. After starting up again defendant would have to go left for at least 26 feet more before his rear wheels were on the crosswalk at the moment of contact. The front of the truck, assuming that the point of contact was about center of the left side of the truck, would have had to travel about 65 feet from its original position while the boy would have had to travel only 20 feet to arrive at the northeast corner. Thus, if the boy was at the centerline of Washington Street before defendant started up, the jury could have found that by the time defendant driver stopped to let the two cars go by, the boy was on the northerly sidewalk and beyond any area of danger, that the driver made a proper observation and that he was justified in going forward. As such a conclusion is supportable by the facts and the permissible inferences from those

facts and would have justified the jury's verdict, the trial court acted correctly in not granting a new trial.

The Appellate Division has taken the position that since Mr. Sobchinsky admitted he made no further observation of the crosswalk after beginning his turn (after stopping to permit the two northbound vehicles to pass), "The conclusion is inescapable that either he did not make the observations he should have made or that he made them ineffectively," and that with nothing obstructing his view, "defendant Sobchinsky could have observed the boy crossing the street if he had made a proper observation when he was about to enter Washington Street." However, bottoming the result the court reached on this basis amounted to acceptance of plaintiff's view of the facts and circumstances surrounding the accident as conclusive and repudiation of defendants' version. As there was reasonable support in the proofs for either thesis, the course adopted by the Appellate Division necessarily usurped the prerogative of the jury and violated the obligation imposed by a settled rule of law upon an appellate tribunal in reviewing a trial court's decision on a motion for a new trial.

The judgment of the Appellate Division is reversed and the order of the trial court denying a new trial is affirmed.

HANEMAN, J. (concurring). I am in agreement with the majority opinion. However, that opinion in approving the test which the trial judge expressed that he had applied in considering the motion for a new trial has not fully delineated the proper guide and standard against which his stated mental processes should be measured. This, I conceive, requires further elucidation.

Although *Franklin Discount Co. v. Ford*, 27 *N. J.* 473 (1958), clearly delineated the difference between a motion for a direction at the close of the trial and a motion for a new trial after a jury verdict, there still appears to remain some confusion as to the basic distinction between these two

motions and the meaning of "weigh the evidence" used in connection therewith.

It haš been said that, upon a motion for a directed verdict, the trial court cannot weigh the evidence but must accept as true all evidence which supports the view of the party against whom the motion is made and must give him the benefit of all legitimate inferences which are to be drawn therefrom in his favor. *Melone v. Jersey Central Power and Light Co.,* 18 *N. J.* 163 (1955).

In *Franklin Discount Co. v. Ford,* 27 *N. J.* 473, 487, it was said:

"Where the judge, by the application of the reasoning processes of the mind to the evidence adduced in the case, may properly conclude that fair-minded men cannot honestly differ as to the conclusions to be drawn from the proofs, the motion for judgment should be granted."

Thus it is seen that the words "weigh the evidence" are used in a very restricted sense. In effect, it is an untrue statement to say that the judge does not "weigh the evidence." The function of applying his "reasoning processes of the mind to the evidence adduced" requires a weighing, *i.e.,* evaluation, analysis, or sifting of the evidence, but in the light of the specific directive guides and for a limited purpose. He must, in so doing, as noted, accept as true all the evidence which supports the view of the party against whom the motion is made and must give him the benefit of all legitimate inferences therefrom in his favor. If upon performing this function the court determines that reasonable men might honestly disagree as to the essential facts, the motion must be denied and the matter be submitted to the jury. The prohibition against "weighing" concerns the usurpation of the constitutional jury function of deciding on whose behalf the evidence so adduced is inclined to favor. The significance of this word, therefore, is only that the judge may not evaluate the evidence as would a jury to ascertain in whose favor the evidence preponderates. It is therefore seen that a statement that there exists a complete restriction against "weighing" is inaccurate.

A motion for a new trial on the ground that the verdict is against the weight of the evidence, on the other hand, partakes of an entirely different nature. There can be no doubt that such a motion constitutes, to some extent at least, an invasion into the constitutional province of the jury. But by the same token it does not interfere with that function. It serves a restraining and prophylactic purpose which is to prevent a miscarriage of justice. The court acts, therefore, as a check in order to make certain the jury does not abuse its powers. Such a motion should be granted only where to do otherwise would result in a miscarriage of justice shocking to the conscience of the court.

In *Colacurcio Contracting Corp. v. Weiss,* 20 *N. J.* 258, 262, the court said:

"The right to trial by jury secured by the Constitution does not immunize a jury verdict from nullification in any case where it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice or passion. The rules of court expressly authorizing the upsetting of the verdict in such case; *R. R.* 4:61-1(*a*) in the trial court and *R. R.* 1:5-3(*a*) in the appellate courts, do not unconstitutionally invade this basic right. There is no constitutional protection of error so fundamental, *Hager v. Weber,* 7 *N. J.* 201 (1951).

The constitutional provision neither enlarges nor restricts the right to jury trial, but merely preserves it as it existed at common law at the time of the adoption of our original Constitution in 1776. *Steiner v. Stein,* 2 *N. J.* 367 (1949). An inquiry into the weight of the evidence, either in a civil or a criminal case, governed by the cited standard is not in derogation of the common law right of trial by jury and therefore, as the Constitution secures no greater right, neither is such inquiry in derogation of the Constitution. * * *"

See also 6 Moore, Fed. Practice 3712 (1961).

In 8 *Ill. L. Rev.* 287, 401 (1913) it was stated that

"The whole of the reason underlying them [motions for directed verdict and new trial] always has been to give legal effect to the community's hostility to the exercise of arbitrary power by the jury. As the substantive law, or the expression of the community's sense of right, always has been against the exercise of arbitrary power by judges in the decision of questions of law within their province, so it always has been against the exercise of arbitrary power by the jury in

the decision of questions of fact within their province. * * * There can be no question the motion for a new trial * * * carried the judicial power into the pre-existing province of the jury. But this evil always has been thought less than the evil of arbitrary power in the jury, subject to no restraint or check."

In *Hager v. Weber,* 7 *N. J.* 201, 210 (1951), the court said:

"The indubitable principle of the *Kohl* [*Kohl v. State,* 59 *N. J. L.* 445] and *Knight* [*State v. Knight,* 96 *N. J. L.* 461] cases is that the 'finality' inherent in the then constitutional courts did not render immune to appellate review a verdict that plainly transcended the province of the jury in that it was not 'justly' sustainable on the evidence. There was no constitutional protection of error so fundamental. The appellate tribunal cannot invade the constitutional office of the jury; it may not merely weigh the evidence where it is fairly susceptible of divergent inferences and substitute its own judgment for that of the jury. But, if the verdict be so far contrary to the weight of the evidence as to give rise to the inescapable conclusion of mistake, passion, prejudice, or partiality, it cannot serve to support the judgment, and appellate correction of the error is not an interference with the constitutional security of the inferior court or the attribute of finality on the facts inherent in its judgments or the constitutional right of trial by jury. As respects the appellate corrective process, there is no essential difference between a verdict that comes from misdirection and a verdict that constitutes a palpable perversion of the jury function. A verdict that rests upon testimony competent to sustain the inference implied in such a finding is ordinarily conclusive; *e converso,* it is not. *Smith v.* [*P.*]*Lorillard Co.,* 67 *N. J. L.* 361 (*Sup. Ct.* 1902). The court may not set aside a verdict merely because, in its opinion, the jury upon the evidence might well have found otherwise. *Knickerbocker Ice Co. v. Anderson,* 31 *N. J. L.* 333 (*Sup. Ct.* 1865). This conception of the weight of the evidence governs the trial court as well as the appellate court; and it applies to civil and criminal causes. *State v. Karpowitz,* 98 *N. J. L.* 546 (*E. & A.* 1923); *Boesch v. Kick,* 97 *N. J. L.* 92 (*Sup. Ct.* 1922), affirmed 98 *N. J. L.* 183 (*E. & A.* 1922); *Queen v. Jennings,* 93 *N. J. L.* 353 (*Sup. Ct.* 1919); *Floersch v. Donnell,* 82 *N. J. L.* 357 (*Sup. Ct.* 1912); *Juliano v. Abeles,* 114 *N. J. L.* 510 (*Sup. Ct.* 1935)."

In *Mt. Adams & E. P. Inclined R. Co. v. Lowery,* 74 *F.* 463, 476 (6 *Cir.,* 1896), the court said:

"* * * there is a difference between the legal discretion of the court to set aside a verdict as against the weight of evidence, and that

obligation which the court has to withdraw a case from the jury, or direct a verdict, for insufficiency of evidence. In the latter case it must be so insufficient in fact as to be insufficient in law; in the former case it is merely insufficient in fact, and it may be either insufficient in law, or may have more weight, and not enough to justify the court, in exercising the control which the law gives it to prevent unjust verdicts, to allow a verdict to stand. * * * We do not think, therefore, that it is a proper test of whether the court should direct a verdict, that the court, on weighing the evidence, would, upon motion, grant a new trial. A judge might, under some circumstances, grant one new trial and refuse a second, or grant a second and refuse a third. In passing upon such motions he is necessarily required to weigh the evidence, that he may determine whether the verdict was one which might reasonably have been reached. But, in passing upon a motion to direct a verdict, his functions are altogether different. In the latter case we think he cannot properly undertake to weigh the evidence. His duty is to take that view of the evidence most favorable to the party against whom it is moved to direct a verdict, and from that evidence, and the inferences reasonably and justifiably to be drawn therefrom, determine whether or not, under the law, a verdict might be found for the party having the onus."

The standard to be applied by our rules as stated in *R. R.* 4:61–1, delineates "miscarriage of justice" as follows:

"On a motion for a new trial in an action tried before a jury, the trial judge shall not set aside the verdict of the jury as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice or passion."

As a consequence, the trial judge upon such a motion is obliged to "weigh the evidence," untrammeled by the restrictions attendant upon a consideration of a motion for a direction. This, however, is for the sole purpose of ascertaining whether there is such a clear imbalance of believable evidence to sustain the verdict, as to convincingly demonstrate that the jury had perverted its duty to arrive at an impartially reasoned verdict. This conclusion may be attained when there is a total absence of any believable evidence to sustain the verdict or when the verdict can be vindicated only if bottomed upon patently false or unbelievable evidence. Then

the jury may be said to have been moved by mistake, partiality, prejudice, or passion which resulted in a miscarriage of justice. When the court so finds, the motion should be granted.

In the matter *sub judice,* it is apparent that the trial judge was expressing the proper concept of the limits of his power on a motion for a new trial as against the weight of the evidence. In substance he was saying that he could and did weigh the evidence only to decide whether there was such an evidential imbalance and not to ascertain whether, in the face of evidence subject to divergent inferences, the jury had reached the same result which would have been attained by him.

WEINTRAUB, C. J., JACOBS, J. and FRANCIS, J. (dissenting). The legal principles are easily stated. The test for submitting a case to the jury is whether men may reasonably disagree as to the facts or the inferences from them. Upon a motion for a new trial, the test is not whether a verdict could have been directed but whether, notwithstanding that men may disagree, the verdict nonetheless is so contrary to the *weight* of the evidence as to bespeak mistake, partiality, prejudice or passion. *R. R.* 1:5–3(a). More tersely, the question is whether the result strikes the judicial mind as a miscarriage of justice, and of course in that inquiry the court must necessarily *weigh* the evidence. *Franklin Discount Co. v. Ford,* 27 *N. J.* 473, 490 (1958).

A motion for a new trial must be made to the trial judge before the issue may be offered on appeal. *R. R.* 1:5–3(a). The reason is that the trial judge has the feel of the case and is better situated than an appellate court to assay credibility when credibility is pivotal. Accordingly a reviewing court must take into account the views of the trial judge insofar as firsthand observation may be significant, but, having done so, it remains the duty of the reviewing court to determine whether in its view there was a manifest denial or miscarriage of justice. *Fisch v. Manger,* 24 *N. J.* 66, 80 (1957);

Brochin and Sandler, "Appellate Review of Facts in New Jersey, Jury and Non-Jury Cases," 12 *Rutgers L. Rev.* 482, 503 (1958).

This eight-year-old child, unlike many children of that age we see and read about, was cautious beyond his years in undertaking to cross the intersection. When he reached the corner, the traffic light was red against him. So, he stopped and waited. The defendant Sobchinsky who had been proceeding in the opposite direction, was halted also by the red light. When it changed, every existing circumstance, factual and legal, bestowed on the pedestrian a paramount right to proceed across the street. He was on the crosswalk and so under ordinary circumstances would have the right of way. *N. J. S. A.* 39:4–36. The green light gave him the right of way—a right heavily weighted in his favor. "A pedestrian crossing or starting across the intersection on a 'Go' signal shall have the right of way over all vehicles, including those making turns, until he has reached the opposite curb or place of safety, and *no operator of a vehicle shall fail to yield the right of way to him." N. J. S. A.* 39:4–32. (Emphasis added.) The school-crossing guard who was near the northwest corner and whose angle of vision was therefore substantially the same as that of the defendant, saw the child waiting on the southeast corner and beckoned him to proceed when the light changed. Without regard to the other circumstances, this signal alone would have given the child the right of way and the right to assume that defendant would permit an uneventful crossing. Moreover, before undertaking the left turn defendant was under a duty to see that such movement could be made with safety, and to give the appropriate hand or mechanical or light signal of his intention to do so. *N. J. S. A.* 39:4–126. As this court has indicated, the making of such a turn required him to seek an opportune moment and to exercise a degree of care in proportion to the increased danger ordinarily incident to that movement. *Ambrose v. Cyphers,* 29 *N. J.* 138, 150 (1959). But in spite of the strong protective cloak with which the law had envel-

oped the child, he was killed on the crosswalk. To us, the evidence overwhelmingly demonstrates that the death was due to defendant's negligence. More specifically, it was due to his lack of reasonably effective observation.

Defendant's testimony revealed he did not make a proper observation. He stopped his truck in the intersection to permit the passage of vehicles coming toward him. He thereupon proceeded on what had to be a curving course, with the side of his truck necessarily bearing in toward the boy who was somewhere to his left. Defendant's direct testimony discloses he did not observe the *entire* crosswalk, but rather only that portion which lay straight ahead of him. His testimony on direct consisted solely of the following:

"Q. Now, as you made your turn were you able to see the crosswalk on *the right side* of Washington as you started over? A. Yes, sir.

Q. And what did you see there? A. A confectionery store and some parked cars." (Emphasis added.)

The cross-examination referred to in the majority opinion must be read in the light of the direct testimony, and so read, it did not reveal a better observation.

Here the evaluation of the issue of defendant's negligence does not depend upon conflicting proof or credibility. The mistake in this case can be found in the prominence given to testimony as to whether the lad had already crossed the center of the street before defendant moved behind oncoming traffic and on to the crosswalk. Whether the boy had or had not is quite irrelevant. If the boy had passed the midway point and reversed his course, he was still entitled to the protection the law accords a pedestrian on a crosswalk with a green light in his favor. The crux of the case remained the failure of defendant to look for pedestrians on his left, an unwarranted assumption on his part that whoever was where he did not look would, despite the absence of a warning signal, see the truck and avoid it. Or to put it another way, defendant asks that it be speculated that *if* he had looked

462

when he should have, he would have seen the boy at a place of complete safety from which thereafter the boy suddenly rushed to his death. There was no evidence of any such movement by the boy, and hence no basis to find that defendant's carelessness was not a causative factor. And the same lack of proof makes extremely tenuous any suggestion that defendant carried his burden of proving the boy was contributorily negligent.

The Appellate Division found the verdict was a miscarriage of justice. We agree that it was. But if we harbored a doubt, we would not reverse on that account. We should uphold the Appellate Division in its exercise of its supervisory power unless we are persuaded that it was plainly wrong. It should not be a function of our court to review the judgments of the Appellate Division when there is no misapprehension of the controlling principles of law and when the issue for us would be at best a debatable question whether the facts justified its action.

We would therefore affirm the judgment of the Appellate Division.

*For reversal* — Justices PROCTOR, HALL, SCHETTINO and HANEMAN—4.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS and FRANCIS—3.