**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2588-17T1

BOGUSLAW KRZAK, a/k/a
BOGDAN KRZAK,

     Plaintiff-Appellant,

v.

JOSEPH FASO,

     Defendant-Respondent.

_____

Argued telephonically February 12, 2019 –
Decided March 5, 2019

Before Judges Hoffman, Suter, and Geiger.

On appeal from Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-1050-16.

Dominik Rostocki, attorney for appellant.

Raymond F. Danielewicz, attorney for respondent.

PER CURIAM

     In this verbal threshold case, plaintiff Boguslaw Krzak appeals from the denial of his motions for a directed verdict, a judgment notwithstanding the

verdict, and a new trial following a verdict for defendant. The jury unanimously found plaintiff did not suffer a permanent injury as a result of the accident within the meaning of the limitation on lawsuit option of the Automobile Insurance Cost Reduction Act (AICRA), N.J.S.A. 39:6A-8(a). Plaintiff contends the trial court erred by denying his motions because it is beyond dispute he suffered permanent injuries as a result of the accident; thus, the jury's verdict was against the weight of the evidence. We disagree and affirm.

I.

On November 7, 2014, plaintiff's vehicle was struck by a vehicle operated by defendant Joseph Faso. Plaintiff claimed permanent injuries to his neck, back, left shoulder, and left knee. He also claimed the resulting pain restricted his daily activities and prevented him from returning to work. At the time of the trial, plaintiff was only taking Ibuprofen.

Plaintiff testified he was driving on Spruce Street in Ewing, when defendant, who had been stopped in a designated left turn only lane, departed that lane and struck the driver's side of plaintiff's vehicle. Plaintiff called the police, but did not request an ambulance or emergency treatment at the scene, and was driven home by his wife. Plaintiff's vehicle was not towed from the

2

scene.  Immediately after the collision, plaintiff drove it to a parking lot near the scene, and it was driven from there to an auto body shop the next day.

Plaintiff did not seek medical care or treatment on the day of the accident. Two days later he went to the emergency room.  He began chiropractic treatment exactly two months after the accident.

Defendant disputed plaintiff's version of the accident, claiming he turned on his blinker and waited until he had sufficient time to enter the right lane without incident.  He asserted the accident occurred when plaintiff struck the rear of his vehicle.  Defendant denied responsibility for the accident and also disputed the nature and extent of the permanent injuries claimed by plaintiff.

Plaintiff was questioned extensively about damage to his vehicle.  He testified defendant's vehicle struck his with such force his vehicle was pushed across the street.  This caused damage to the wheels on the passenger's side when they hit the curb, and that the impact rendered the driver's side door inoperable, which forced him to exit the car through the passenger's side door.  Plaintiff also testified there was damage to the front driver's side fender, and that the driver's side headlamp was "crashed."

On  cross-examination,  plaintiff's  testimony  was  impeached  with photographs of his vehicle, which showed no damage to the driver's side door,

  A-2588-17T1

fender or headlamp, or the wheels on the passenger's side. After examining the photographs, plaintiff admitted "there are no dents from the driver's side" and the photographs showed no damage to the tires on the passenger side of the vehicle.

Plaintiff's testimony was further impeached when he was asked if he remembered testifying at deposition the headlamp was "busted" and "hanging." Plaintiff stated, "No. I didn't say that." Defense counsel then read an excerpt from plaintiff's deposition showing he did so testify. When asked to explain the discrepancy between his deposition and trial testimony, he was unable to provide an explanation beyond, "I can't say."

Defense counsel further impeached plaintiff's credibility by pointing out additional discrepancies between his deposition and trial testimony. For example, at trial plaintiff testified he experienced "very strong," "horrible" pain in his shoulder at the accident scene. In contrast, at his deposition, plaintiff testified he only experienced "discomfort," and not "much pain," in his shoulder at the scene. Plaintiff was also impeached on cross about his testimony regarding whether the epidural injections he received in his spine provided any relief; whether his treating doctors had recommended surgery; whether he was still working full-time as an industrial painter at the time of the accident or if he

4

was retired; and whether he had continued his volunteer activity since the accident.

Each side presented videotaped testimony of their medical experts. Lawrence I. Barr, D.O., an orthopedic surgeon, and Konstantine Fotiou, D.C., a chiropractor, testified on behalf of plaintiff. Alan Joseph Sarokhan, M.D., an orthopedic surgeon, testified on behalf of defendant. The experts offered differing diagnoses and causes of plaintiff's medical conditions. Dr. Barr and Dr. Fotiou opined plaintiff suffered permanent injuries as a result of the accident. Dr. Sarokhan opined all of plaintiff's conditions were the result of age-related degenerative change and were not proximately caused by the accident.

Dr. Barr was not plaintiff's treating physician. He conducted a one-time independent medical examination (IME) of plaintiff on December 19, 2016. Although Dr. Barr opined plaintiff suffered permanent injuries as a result of the accident, he admitted he was not provided any of plaintiff's medical records predating the accident. Therefore, Dr. Barr had no medical records to corroborate the pre-accident history provided by plaintiff. Based on objections raised during his deposition and the subsequent ruling by the trial court, Dr.

A-2588-17T1

Barr's testimony was limited to his clinical examination and his review of the shoulder and knee MRIs.

Dr. Barr testified a March 26, 2015 MRI of plaintiff's left knee revealed multiple problems including "a complex tear of his medial meniscus." Dr. Barr acknowledged plaintiff had "degenerative joint disease in his left knee" and all of the changes observable in the MRI were degenerative in nature with the exception of the medial meniscal tear, which he believed to be plaintiff's "biggest problem."

Dr. Barr testified plaintiff's medial meniscus injury would cause him problems walking. However, Dr. Barr was unable to explain why the emergency room report from plaintiff's visit two days after the accident stated: "slight vague pain in the left leg but nonspecific and can't localize and is able to walk without problem."

The entirety of plaintiff's orthopedic medical care following the accident was two visits with Kyle Thomas Stier, M.D. in the month after the accident. Dr. Barr was unable to explain why those records described plaintiff's knee as "stable" with no swelling, "good range of motion," and "good strength across the knee."

A-2588-17T1

Dr. Barr also testified a March 26, 2015 MRI of plaintiff's left shoulder showed a "full thickness retracted rotator cuff tear." Dr. Barr acknowledged plaintiff had degenerative joint disease in his left shoulder, but he believed the rotator cuff tear was "accident-related." Dr. Barr was asked whether there were any "objective abnormal findings" noted during plaintiff's left shoulder exam at the emergency room, and admitted there were none. Dr. Barr also admitted Dr. Stier's notes were inconsistent with a catastrophic injury to plaintiff's left shoulder.

Dr. Fotiou was qualified as an expert in the field of chiropractic medicine, and he, like Dr. Barr, did not review any of plaintiff's medical records predating the accident. He also never personally reviewed any of plaintiff's MRI films. Dr. Fotiou provided chiropractic treatment to plaintiff from January 7, 2015 to September 10, 2015, seeing plaintiff on approximately eighty occasions in those eight months. Dr. Fotiou opined plaintiff suffered permanent injury as a result of the accident. He was cross-examined at length regarding the basis for his opinions and inconsistencies between his findings and those contained in the medical records of other treating physicians.

Dr. Sarokhan conducted an IME of plaintiff on September 29, 2016. Dr. Sarokhan offered testimony regarding the range of motion in plaintiff's left knee,

stating plaintiff demonstrated "he couldn't bend beyond about twenty degrees . . . and yet when he got on and off the exam table, he was able to fully extend the knee. He flexed to about 90 degrees." A range of motion of approximately ninety degrees is consistent with Dr. Barr's testimony plaintiff had a range of motion of ninety-five degrees.

Dr. Sarokhan had plaintiff perform grip and pinch strength tests. When plaintiff performed the grip test, the machine "could not detect any demonstrable contraction of the muscles" on the left. Similarly, when plaintiff performed the pinch test, the meter reflected "no effort" on the left. When asked to provide an objective basis for plaintiff's purported inability to use his left hand, Dr. Sarokhan stated he "could not explain" why "there was no voluntary muscle contraction." Similarly, although plaintiff claimed "his entire left side was numb," Dr. Sarokhan "could not identify a dermatomal deficit."

Dr. Sarokhan testified plaintiff's left shoulder moved with "varying degrees of flexion anywhere from being able to elevate his arm to sixty degrees . . . to one hundred fifty degrees." When asked whether plaintiff's emergency room records were consistent with plaintiff's claim he suffered an acute traumatic tear of tendons in his left shoulder, Dr. Sarokhan responded, "No," because he did not find any notation that plaintiff was unable to move his

A-2588-17T1

shoulder.  Dr. Sarokhan was also able to review medical records from plaintiff's family doctor from parts of 2016 and 2017, and none of those records indicated plaintiff complained of an inability to move his left arm.

Dr. Sarokhan also stated the "range of motion" in plaintiff's "lumbar spine" or "low back," was "very variable."  While the average range of motion is seventy to ninety degrees, plaintiff's range of motion "varied anywhere from twenty to seventy, depending on whether he had to bend to get up on the exam table or not."  Dr. Sarokhan also stated he "had some trouble eliciting a consistent range of motion" from plaintiff with regard to his neck because plaintiff "seemed to move more easily" when they were conversing and when plaintiff was pointing out his complaints than when Dr. Sarokhan "actually asked him to look up and down or to the right and left."

When Dr. Sarokhan was asked to "sum up" a "general explanation" for plaintiff's condition on the date of the exam, he replied

> So here's a gentleman who essentially tells me and demonstrates to me that he can't really do much of anything with his left side, and yet when I examined him, I find that the objective portions of his exam are normal, the subjective portions of his exam where I've asked him to move are inconsistent.

As of the time he examined plaintiff, Dr. Sarokhan "could not explain that impairment on a medical basis."

On the basis of the clinical exam alone, Dr. Sarokhan did not find any objective evidence of injury to plaintiff's neck, low back, left shoulder, or left knee. He was also unable to find any evidence of nerve damage in plaintiff's arms or legs that he could demonstrate objectively.

Dr. Sarokhan testified that all of the changes he observed on the MRI of plaintiff's left knee were "age-related degenerative change." He stated the findings were "common" for "people as they age" and "this is the way knees age." Dr. Sarokhan also testified "[a] direct blow is, more likely than not, not the cause of a meniscal tear. If you're a driver and struck on a driver's side, if you were going to have a meniscal injury, it would be on the lateral side, not the medial side." Instead, he testified "the most common" or "likely way to tear a meniscus, traumatically, by injury, is on a planted leg with a twisted injury." Dr. Sarokhan elaborated, "You're going to know you did it, it's very memorable." Ultimately, Dr. Sarokhan opined a medial meniscus tear of the left knee was not consistent with plaintiff's claim of left side impact with the driver's door.

Dr. Sarokhan testified the MRI of plaintiff's left shoulder indicated "degenerative change of longstanding duration." He stated the MRI revealed the "supraspinatus muscle, which is a portion of the rotator cuff muscle, . . . [was] torn and a lot of it ha[d] been replaced by fat. What does that tell you?

10

That tells you that that didn't happen two months ago." Ultimately, he opined all the findings were "indicative of something that's been there for a long time, much longer than . . . four months."

At the time of the accident, plaintiff was seventy-one years old. Dr. Sarokhan opined the most likely cause of all of the MRI findings was age-related degenerative change. Ultimately, when asked his opinion as to whether plaintiff sustained any permanent injury as a result of the accident, Dr. Sarokhan stated "I'm not here to tell you [plaintiff] doesn't hurt;" however, "on an objective basis, I did not see any evidence of permanent injury that I could relate to the November 7, 2014 accident."

Prior to opening statements, plaintiff moved in limine to have the question of whether he suffered permanent injuries proximately caused by the accident taken from the jury and decided as a matter of law. The trial court denied the motion without prejudice. After the close of evidence, plaintiff renewed his motion for a directed verdict on the issue of permanency and causation. Plaintiff's motion was again denied.

The jury returned a verdict in favor of defendant. Although the jury found defendant's negligence was the proximate cause of the accident, it unanimously found plaintiff failed to prove by a preponderance of the objective, credible

11

evidence that he suffered a permanent injury proximately caused by the accident. A judgment of no cause of action in favor of defendant was entered on November 27, 2017.

Plaintiff then moved for a judgment notwithstanding the verdict, and alternatively, for a new trial. The trial court denied the motion. This appeal followed.

Plaintiff argues: (1) the trial erred in denying plaintiff's motions for judgment as to permanency and verbal threshold because there was no genuine issue of material fact as to permanency; (2) the trial erred by allowing the jury to decide proximate cause of the injuries because there was no genuine issue of material fact, shown by objective, credible medical evidence, whether plaintiff's permanent injuries were caused by the crash; (3) the trial erred in denying plaintiff's renewed motion for judgment notwithstanding the verdict; and (4) the trial erred in denying plaintiff's motion for a new trial as to damages only.

## II.

### A.

This case implicates disguised motions for summary judgment filed as motion in limine returnable on the day of trial; directed verdicts at the end of all the evidence, Rule 4:40-1; judgments notwithstanding the verdict, Rule 4:40-2;

12

and motions for a new trial, Rule 4:49-1.  The standard governing motions made pursuant to Rule 4:40-1 and Rule 4:40-2 is the same.  Verdicchio v. Ricca, 179 N.J. 1, 30 (2004).  When reviewing Rule 4:40 motions for judgment, "we apply the same standard that governs the trial courts."  Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016) (citing ADS Assocs. Grp. v. Oritani Sav. Bank, 219 N.J. 496, 511 (2014)).

It is well-established that in limine motions that are summary judgment motions in disguise have been repeatedly condemned.  Seoung Ouk Cho v. Trinitas Reg'l Med. Ctr., 443 N.J. Super. 461, 470-74 (App. Div. 2015).  "Our court rules simply do not countenance the practice of filing dispositive motions on the eve of or at the time of trial."  L.C. v. M.A.J., 451 N.J. Super. 408, 411 (App. Div. 2017).  A motion in limine filed on the eve of trial "is permissible only when it addresses preliminary or evidentiary issues."  Ibid.  Even in that instance, those applications are disfavored and should be heard only sparingly.  Ibid. (citations omitted).  A motion in limine is not a "summary judgment motion that happens to be filed on the eve of trial.  When granting a motion will result in . . . the suppression of a defendant's defenses, the motion is subject to Rule 4:46, the rule that governs summary judgment motions."  Cho, 443 N.J. Super.

at 471. The motion must comply with all of the timelines applicable to summary judgment motions. Ibid.

Motions made pursuant to Rule 4:40 will be granted "only if, accepting as true all evidence supporting the party opposing the motion and according that party the benefit of all favorable inferences, reasonable minds could not differ." Edwards v. Walsh, 397 N.J. Super. 567, 571 (App. Div. 2007) (citing Dolson v. Anastasia, 55 N.J. 2, 5 (1969)). "The point is that the judicial function here is quite a mechanical one. The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." Dolson, 55 N.J. at 5-6.

Our scope of review for Rule 4:49-1 motions differs. Judge v. Blackfin Yacht Corp., 357 N.J. Super. 418, 424 (App. Div. 2003). Jury verdicts are entitled to considerable deference. Hayes v. Delamotte, 231 N.J. 373, 385 (2018). Therefore, "a motion for a new trial 'should be granted only where to do otherwise would result in a miscarriage of justice shocking to the conscience of the court.'" Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521 (2011) (quoting Kulbacki v. Sobchinsky, 38 N.J. 435, 456 (1962)). Our courts have defined a "miscarriage of justice" as a "pervading sense of 'wrongness'" that stems from a "manifest lack of inherently credible evidence to support the

14

finding, obvious overlooking or under-valuation of crucial evidence, [or] a clearly unjust result." Id. at 521-22 (alteration in original) (quoting Lindenmuth v. Holden, 296 N.J. Super. 42, 48 (App. Div. 1996)). "The standard of review on appeal from decisions on motions for a new trial is the same as that governing the trial judge – whether there was a miscarriage of justice under the law." Hayes, 231 N.J. at 386 (quoting Risko, 206 N.J. at 522).

B.

The verbal threshold "is a cost-containment measure that provides lower premium payments in exchange for a limitation on the insured's right to sue for noneconomic damages." Agha v. Feiner, 198 N.J. 50, 60 (2009) (citing DiProspero v. Penn, 183 N.J. 477, 480-81 (2005)). Plaintiffs subject to the verbal threshold are not eligible to recover noneconomic damages such as pain and suffering, impairment, disability, and loss of enjoyment of life, unless they have "sustained a bodily injury which results in death; dismemberment; significant disfigurement or significant scarring; displaced fractures; loss of a fetus; or a permanent injury within a reasonable degree of medical probability, other than scarring or disfigurement" as a result of an automobile accident. N.J.S.A. 39:6A-8(a). An injury is permanent if it "has not healed to function normally and will not heal to function normally with further medical treatment."

15

<u>Ibid.</u> In order to vault the threshold, plaintiff must prove he suffered a permanent injury through objective, credible medical evidence. <u>Agha</u>, 198 N.J. at 60-61. Objective proof means the injury must be verified by physical examination or medical testing and cannot be based solely upon the plaintiff's subjective complaints. <u>Ibid.</u> "Thus, subjective tests, such as those that evaluate range of motion, will not suffice." <u>Id.</u> at 60 (citing <u>Davidson v. Slater</u>, 189 N.J. 166, 190 (2007)).

III.

Our review of the record and applicable legal standards leads us to conclude plaintiff's motions for a directed verdict, a judgment notwithstanding the verdict, and a new trial were properly denied.

On the eve of trial, plaintiff moved for judgment or a directed verdict as to the contested issue whether he suffered a permanent injury proximately caused by the accident. Although labelled a motion in limine, the motion was a disguised motion for partial summary judgment. The trial court properly denied the motion.

As we recognized in <u>Cho</u>, "[o]ur Rules of Court provide explicit requirements for the timing of summary judgment motions, what must be presented in support of and in opposition to such motions, and the standard for

16

deciding them." 443 N.J. Super. at 470 (citing R. 4:46-1, -2). Motions for summary judgment must be "returnable no later than [thirty] days before the scheduled trial date, unless the court otherwise orders for good cause shown." R. 4:46-1. The non-moving party must be served with the motion at least twenty-eight days before the return date, and is afforded eighteen days to file opposing papers. Ibid.

In this case, plaintiff's initial motion for judgment or a directed verdict violated the timing requirements of Rule 4:46-1 in every respect. Defendants had less than one day to prepare and submit a response, a clear violation of defendant's right to due process. Cho, 443 N.J. Super. at 470. It would have been reversible error to grant the motion even if it was substantively meritorious. Id. at 474-75. Aside from being procedurally barred, the trial court properly denied the motion without prejudice given the disputed material facts with regard to whether plaintiff suffered a permanent injury proximately caused by the accident.

Plaintiff renewed his motion for a directed verdict on the issue of permanency and causation at the close of the evidence. He also moved for a judgment notwithstanding the verdict. Our opinion in Sackman v. New Jersey

Manufacturers Insurance Co., 445 N.J. Super. 278 (App. Div. 2016), is instructive.

In Sackman, the plaintiff, who was forty-nine years old on the date of the collision, left the scene of the accident in his own vehicle, but later claimed permanent injuries to the left side of his body, particularly his left shoulder, as a direct result of the accident. Id. at 281-83. After both sides presented conflicting expert medical testimony, the "plaintiff moved to 'bar the defense from raising the verbal threshold defense in their summation as well as removing it [from] the jury charge and the jury verdict questionnaire.'" Id. at 289 (alteration in original). The motion was denied, and the jury returned a unanimous verdict after deliberating for approximately twenty minutes. Id. at 281, 289. The jury found the plaintiff had not proven, by a preponderance of the evidence, he sustained a permanent injury as a direct result of the accident. Id. at 281. The trial court also subsequently denied the plaintiff's motion for a new trial. Ibid.

On appeal, the plaintiff argued the trial court "erred in denying his motion to preclude the jury from having to find he suffered a permanent injury" "proximately related" to the accident because "the evidence presented at trial indisputably established th[at] element of his cause of action as a matter of law."

Id. at 281-82. The defense argued the jury's verdict was supported by the evidence, especially when the "plaintiff's own testimony conflicted at times, creating a clear issue of credibility for the jury." Id. at 290. We held "where the question of permanency under N.J.S.A. 39:6A-8(a) is hotly contested, such as it was in this case, the jury, acting within its fact-finding role, must determine whether plaintiff has satisfied his statutory burden by a preponderance of the evidence." Id. at 292 (citing Ames v. Gopal, 404 N.J. Super. 82, 85-86 (App. Div. 2008)). We also found the record "replete with evidence from which a rational jury could find plaintiff did not present sufficient evidence to satisfy his statutory burden." Id. at 290. We thus affirmed the denial of the plaintiff's motions. Id. at 282.

We see no reason to depart from such sound reasoning. Plaintiff was not entitled to prevail on his Rule 4:40 motions. In deciding the motion, the trial court was required to accept all of the evidence in favor of defendant as true, including Dr. Sarokhan's testimony. The trial court was also required to give defendant all favorable inferences. After doing so, the trial court could grant plaintiff's motion only if a reasonable jury could not return a verdict in defendant's favor. The conflicting medical evidence was more than sufficient to justify submission to a jury. In fact, taking the question of whether plaintiff

suffered a permanent injury proximately caused by the accident away from the jury would have been reversible error.  See Ames, 404 N.J. Super. at 86 (holding the differing expert "testimony presented a factual question which the jury had to resolve as to whether plaintiff had suffered a permanent injury under the statute").  We thus find no error in the trial court's decision to allow the jury to fulfill its intended function; nor in the trial court's denial of plaintiff's motion for a judgment notwithstanding the verdict.

We likewise agree the trial court properly denied plaintiff's motion for a new trial.  After canvassing the record, we have no trouble concluding the evidence was more than adequate to support the jury verdict.  Plaintiff's attempts to conflate permanency and proximate causation are unavailing.  There is no factual or legal basis to conclude the jury was required to accept the testimony of plaintiff's experts over defendant's expert.  The evidence was not so one-sided as to require a reasonable jury to conclude plaintiff suffered a permanent injury as a proximate result of the accident.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2588-17T1