NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3230-13T4

STUART SACKMAN and
PATRICIA SACKMAN, His Wife,

     Plaintiffs-Appellants,

v.

NEW JERSEY MANUFACTURERS
INSURANCE COMPANY,

     Defendant-Respondent.

┌─────────────────────────┐
│  **APPROVED FOR PUBLICATION**  │
│                         │
│     **April 26, 2016**      │
│                         │
│    **APPELLATE DIVISION**   │
└─────────────────────────┘

Argued October 7, 2015 – Decided April 26, 2016

Before Judges Fuentes, Koblitz and Gilson.

On appeal from Superior Court of New Jersey,
Law Division, Middlesex County, Docket No.
L-8522-11.

Michael L. Pescatore argued the cause for
appellants (Shamy, Shipers & Lonski, P.C.,
attorneys; David P. Levine, on the brief).

Susan A. Lawless argued the cause for
respondent (Purcell, Mulcahy, Hawkins,
Flanagan & Lawless, L.L.C., attorneys; Ms.
Lawless, of counsel and on the brief; Alyssa
K. Weinstein, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

On June 2, 2008, a car driven by Earl Smith rear-ended plaintiff[1] Stuart Sackman's car while it was stopped on Route 22 in Bridgewater Township. Plaintiff claims he sustained permanent injuries on the left side of his body, particularly his left shoulder. Plaintiff settled his claims against Smith and sought underinsured motorist (UIM) compensation from New Jersey Manufacturer Insurance Company (NJM), the carrier that issued his automobile insurance policy.[2] The policy issued by NJM contained a provision pursuant to the Automobile Insurance Cost Reduction Act (AICRA), N.J.S.A. 39:6A-1.1 to -35, requiring plaintiff to show he suffered a permanent injury, as defined in N.J.S.A. 39:6A-8(a), in order to recover compensatory damages.

Unable to reach a resolution of his UIM claims, plaintiff filed suit against NJM. The matter was tried in the Law Division before a jury over a period of three days in January 2014. After deliberating for approximately twenty minutes, the jury returned a unanimous verdict finding plaintiff did not prove, by a preponderance of the evidence, he sustained a permanent injury that was proximately related to the June 2,

---

[1] Because Patricia Sackman's per quod claims derive from her status as Stuart Sackman's spouse, we will refer to "plaintiff" in the singular.

[2] It is undisputed plaintiff provided NJM with timely notice of his intention to settle his claims against Smith. See Longworth v. Van Houten, 223 N.J. Super. 174, 194 (App. Div. 1988).

2008 accident. The trial court thereafter denied plaintiff's motion for a new trial.

Plaintiff now appeals arguing the trial judge erred in denying his motion to preclude the jury from having to find he suffered a permanent injury that is proximately related to the June 2, 2008 accident. Plaintiff claims the evidence presented at trial indisputably established this element of his cause of action as a matter of law. Alternatively, plaintiff argues the brevity of the jury's deliberations is per se indicative of bias and constitutes a clear miscarriage of justice. Finally, in the course of her opening statement to the jury, NJM's counsel referred to the tortfeasor as "defendant." Plaintiff argues the court's curative instructions to the jury in response to his counsel objection were insufficient to cure NJM's counsel's misleading characterization of the trial and constitutes reversible error.

We reject these arguments and affirm. We derive the following facts from the evidence presented at trial.

I

Plaintiff was forty-nine years old when the Subaru Tribeca SUV he was driving was struck from behind by a 1970 two-seater Volvo driven by Earl Smith, a retired New Brunswick firefighter. The parties were travelling westbound on Route 22 in Bridgewater

Township.  According to Smith, as he attempted to stop his car, he inadvertently "caught the gas pedal and the break [sic] at the same time."  This caused his car "to literally [lift] itself up, but it wouldn't stop because the engine was pulling it."  He "tapped" plaintiff's car going "somewhere between five and ten miles an hour."

Plaintiff testified the Volvo was travelling approximately twenty miles per hour at the time it collided with his Subaru.  Plaintiff also claimed he was wearing his seatbelt and had both of his hands on the steering wheel at the time of the accident.  As a result of the collision, plaintiff's left elbow struck the closed driver-side car window, causing a "small abrasion" visible as a "pinkish spot."  Plaintiff stepped out of his car and walked to the side of the road to speak with Smith.  They each asked the other if he was "okay" and both responded they were not injured.

An officer from the Bridgewater Township Police Department responded to the scene.  Plaintiff told the officer he was not injured and did not need medical attention or an ambulance.  After providing the officer with his driving credentials, plaintiff returned to his car and drove away.  At trial, NJM's counsel introduced into evidence two photographs depicting the

damage sustained by plaintiff's Subaru Tribeca as a result of the accident.

Before addressing the injuries related to the 2008 accident, plaintiff's counsel questioned him about his medical history. Plaintiff testified he injured his left shoulder three years earlier in a 2005 car accident. His treatment included a cortisone injection, which was effective in relieving his pain. In overcoming this injury, plaintiff particularly noted his high pain threshold:

> I have a really high pain tolerance, so I don't really like to address pain in my head. I like to think past it, which I did and worked out like a dog . . . to bring these muscles and that thing back, which I did. So after a period of time, no, it didn't bother me at all.

Plaintiff testified that on January 19, 1984, he "broke his neck" in a surfing accident on the island of Martinique. "I was body surfing and I caught by a wave [sic] and it slammed me head first into the ground." According to plaintiff, he was diagnosed with a "C-7" fracture, which is located in the cervical area of his spinal cord. As plaintiff explained, "[t]here was a lateral fracture that ended up one millimeter

away from my spine."[3]  In response to his attorney's question, plaintiff testified he recovered from this injury "absolutely." Plaintiff credited his recovery to his rigorous exercise routine, which he characterized as "extreme."  According to plaintiff, he swam twenty to thirty miles per week.  He testified his body "was perfect" before the June 2, 2008 accident.

In addition to these traumatic injuries, plaintiff was diagnosed with diverticulitis and colitis approximately one year before the June 2008 accident.  He had abdominal surgery to address these gastrointestinal problems.  However, plaintiff emphasized that none of the medical incidents he experienced before the June 2008 accident interfered with or affected his ability to perform his job as a "legal videographer."[4]  As plaintiff described to the jury, the physical demands of his job required him to carry up to 150 pounds of equipment and climb "under things" to run wires.

Despite being asymptomatic immediately after the June 2, 2008 accident, plaintiff testified he began to feel "little

---

[3] Despite the technical nature of plaintiff's testimony, defense counsel did not object.  Cf. Berkowitz v. Soper, 443 N.J. Super. 391, 398-402 (App. Div. 2016).

[4] As described by plaintiff, his job as a "legal videographer" consisted of videotaping discovery depositions for attorneys.

twinges and stuff" the morning after the accident. However, because of his "high pain tolerance," he did not seek medical attention. His discomfort intensified two days after the accident. He felt pain only on the left side of his body, from the "scapula" to his left foot. He "knew then something was wrong, really wrong" when he was unable to get out of his bed.

Plaintiff saw his general practitioner, Dr. Scott Yeager, on Monday June 9, 2008, a week after the accident. According to plaintiff, his "chest was on fire and my back was on fire." He consulted an orthopedist and received treatment from a chiropractor after his consultation with Dr. Yeager. The orthopedist administered a cortisone injection in his left shoulder. He did not recall whether he also received physical therapy during this time period.

On March 2, 2009, plaintiff consulted with orthopedic surgeon Dr. Jeffrey S. Abrams, who recommended physical therapy consisting of electrical stimulation and heating pads. The therapy improved the range of motion of his left shoulder. Despite this improvement in his physical condition, he was still unable to swim. He told Dr. Abrams that "no matter how hard I tried to build my muscles again I thought my muscles would be strong enough where I could keep it in place, but it's not how it works."

Dr. Abrams ordered plaintiff to undergo a magnetic resonance imaging (MRI) test. According to Dr. Abrams, the MRI test revealed plaintiff had "damage to his rotator cuff . . . not a tear." Dr. Abrams diagnosed plaintiff as suffering from "a rotator cuff tendinopathy, which means inflamed tendons." Following his standard practice, Dr. Abrams first recommended a conservative non-operative approach. In this case, he directed plaintiff receive therapy and resume exercising.

Dr. Abrams saw plaintiff again approximately six weeks later. At that time, plaintiff reported constant pain without any improvement. Under these circumstances, Dr. Abrams opted to perform a surgical procedure known as an arthroscopy. As explained by Dr. Abrams, this procedure involves drilling "a little hole in the bone;" the physician places a hollow screw into the bone, and stitches it through the screw. Once the screw is in place, the instrument is retrieved leaving the screw behind attached by the stiches. The stitches are then passed through the tissue. On June 3, 2009, Dr. Abrams performed the surgery in an outpatient surgical center, commonly referred to as "same day surgery." Dr. Abrams testified the surgery was performed as expected without complications.

Plaintiff testified he was confined to a recliner chair for nine weeks after the surgery. He also claimed the surgery did

not completely restore him to his pre-accident physical condition. He still experiences pain and feels "absolutely damaged." His left hand "trembles" and he does not have the same grip strength. He feels "pain shooting down [his] arm in the weirdest ways," as if he is having a heart attack. Comparing his physical condition before and after the accident, plaintiff testified:

> My chest hurts on the left side. My -- my left breast, it looks like -- like my pec is hanging a little bit differently than the right. I used to have a duck chest when I swam and I don't have it anymore. I used to have abdominal muscles that they're gone. I now have -- I'm fat -- I'm a fat guy now. I used to be -- I was a monster. I was a man that people would look at and go wow. And I would think yeah, man, you -- you've worked hard for this. You deserve this -- this -- you deserve these people noticing how hard you've applied yourself.

Plaintiff testified he "can't swim anymore because [he] [doesn't] enjoy it anymore because between [his] shoulder blades there's this cracking and stopping sometimes that locks me up in a certain way and it's not smooth." Plaintiff also testified that the injury affected his relationship with his wife and daughters. He does not share time with them as he did before the accident; he does not play with them anymore. Everything he used to do with his teenage daughters is now done by his wife "because they don't need me. They just don't need me the same

9

way." He attributed this estrangement from his children to the injury he sustained in the June 2008 accident. Plaintiff gave this testimony on January 14, 2014.

Finally, with respect to his job as a legal videographer, plaintiff testified on direct examination that he has been unable to resume the physical activities required to perform his job. On cross-examination, plaintiff agreed with Dr. Abrams's medical assessment that he has recovered complete range of motion on his left shoulder. Plaintiff also conceded that his shoulder is completely stable and no longer falls out. As to his ability to work, plaintiff acknowledged that in a form he completed for his chiropractor dated on July 11, 2008, he answered "yes" to the following question: "Have you been able to work since this injury?"

Plaintiff also acknowledged on cross-examination that between 2003 and the accident on June 2, 2008, he sought medical treatment for "an abnormal sensation" in his left arm. Defense counsel also presented plaintiff with documentation indicating that in the summer of 2003 he had seen his family physician "complaining of weakness in [his] upper left extremity[.]" These records also showed plaintiff consulted his primary care physician in July 2003 for "left upper extremity pain for at least a year." The 2003 report also stated plaintiff had

"chronic upper back and left superior shoulder pain with abduction."

In addition to his role as plaintiff's treating physician, Dr. Abrams also testified as an expert witness in plaintiff's case in chief. The jury heard his testimony in a de bene esse videotaped deposition taken on May 21, 2013. After he described the surgery he performed on plaintiff on June 3, 2009, Dr. Abrams opined, within a reasonable degree of medical certainty, that "[t]he most symptomatic injury here was his biceps symptoms, and his biceps symptoms were a direct result of a superior labrum tear. A superior labrum tear is a traumatic event. And the traumatic event in this particular case was a result of an accident because it's a traumatic etiology."

When asked whether the surgery was successful, Dr. Abrams responded:

> [Yes], I think so. I think that it's one of these things where patients, this patient particularly, let's not do in general, this patient is improved. He couldn't do certain things, he can do them now. . . . That being said, there were things he couldn't do that he can do now. And so we would agree, both the patient and I, that he has been improved . . . . And so I think we're both pleased with where we are now from a structural part of his shoulder.

Plaintiff last saw Dr. Abrams for a post-surgical consultation on January 14, 2013, approximately six months

before Dr. Abrams's <u>de bene esse</u> deposition, and one year before the start of the trial. Based on this examination, Dr. Abrams testified plaintiff "continue[d] to have some symptoms in his upper extremity." Plaintiff also complained about "pain along the shoulder blade[,] . . . some pain radiating up and down his left upper extremity[, and] some weakness in his actual grip and side of the neck." Plaintiff told Dr. Abrams his pain level was a two to three on a scale of one to ten.

With respect to whether plaintiff's injuries or symptoms were permanent, Dr. Abrams expressed the following opinion, within a reasonable degree of medical certainty:

> I do feel that there will be permanency. As I stated earlier, patients through multiple reasons will not be pain-free and back to full activities. I think we improve their condition by repairing these damaged structures.
>
> He still has ongoing symptoms three or four years later, and I would not be surprised with that. For now I don't think there's any other surgical intervention, but I do feel that his symptoms have some permanency, and I think that the two to three out of ten in pain is a reasonable expectation.

However, Dr. Abrams also noted that plaintiff's "range of motion of his shoulder [had] improved. It [was] very close to what his range of motion would be on his other shoulder. His strength [was] better. And he did not have any crepitus or grinding or area of concern." According to Dr. Abrams,

> I don't think -- he has a fairly normal range of motion. I don't think the range of motion is a big issue. I think his big issue now is pain. And so I don't think there is really anything else to offer the man . . . . So by fixing his cartilage or fixing the ring around the plate, we were repairing his ligaments. We achieved that goal, but that doesn't necessarily take away all of the problems that go along with the surgery.

Dr. Abrams admitted he had not reviewed certain records pertaining to plaintiff's medical history prior to arriving at his diagnosis. Specifically, Dr. Abrams was not aware that: (1) a neurologist and chiropractor had examined plaintiff in 2003; (2) plaintiff received physical therapy in 2005 at the Kessler Institute for Rehabilitation; (3) plaintiff had an MRI test on his shoulder in 2003; (4) office notes and medical records pertaining to this medical consultation were available; and (5) plaintiff underwent "EMG/NCV testing of his upper extremities in 2003." Finally, Dr. Abrams testified plaintiff did not explain the "mechanics of the injury to him." Plaintiff only told him a car rear-ended his car; he was wearing his seatbelt at the time.

NJM called orthopedic surgeon Dr. Edward M. Decter as an expert witness. He examined plaintiff on September 17, 2010, and again on September 13, 2012. Dr. Decter reviewed the reports describing plaintiff's previous injuries, as well as those relating to this accident. After examining plaintiff on

September 17, 2010, Dr. Decter opined plaintiff's left shoulder was "symmetrical and equal" to his right shoulder. He found plaintiff had a normal internal and external rotation with no evidence of instability. According to Dr. Decter, the surgery was intended to address "some instability of his shoulder where the labrum was torn." Dr. Decter opined that "Dr. Abrams corrected the shoulder instability by his operation." He also found a causal relationship between the shoulder surgery and the torn labrum attributable to the June 2, 2008 accident.

Dr. Decter gave the following testimony with respect to the issue of permanency:

> A. [Y]es, his shoulder has been altered and it wasn't what God gave him, but the whole purpose of what Dr. Abrams did was to reattach the labrum back to the glenoid socket and that's what he did.
>
> Q. And [Dr. Abrams] did it successfully in your opinion.
>
> A. Well, my exact words were he made an excellent functional recovery as it relates to his shoulder surgery. He has regained full mobility without any focal findings. I said Dr. Abrams should be commended on an excellent job of the shoulder reconstruction.
> He also did some other things in the shoulder. He --
>
> Q. Well, before we get to that, Doctor, I just want to now ask you my question after we discussed your definition. After your examination, review of all of the records, did you have an opinion as to whether or not

14

Mr. Sackman suffered a permanent injury as a result of -- to his shoulder as a result of the June 2nd, 2008 accident?

A. He has made a good functional recovery with full motion and good strength. There has been an alteration in the anatomy of his shoulder.

Q. He has full range of motion?

A. He regained his range of motion and he had a good functional outcome.

NJM also called Dr. Eric L. Fremed, who testified via a videotaped de bene esse deposition as an expert in neurology. Based on an examination he performed on October 14, 2012, Dr. Fremed found plaintiff's motor function and range of motion in his left shoulder to be completely normal. In fact, plaintiff had full functional use of both his arms. However, Dr. Fremed noted atrophy of plaintiff's left arm. He opined the atrophy was not related to the June 2008 accident because plaintiff had reported this same condition in 2003. Dr. Fremed opined, within a reasonable degree of medical certainty, that plaintiff had not suffered any permanent neurological injury related to the June 2, 2008 accident.

After NJM concluded its presentation, plaintiff moved to "bar the defense from raising the verbal threshold defense in their summation as well as removing it [from] the jury charge and the jury verdict questionnaire." Defense counsel objected,

arguing the evidence presented to the jury clearly established a disputed issue of fact as to the permanency of plaintiff's injuries as defined in N.J.S.A. 39:6A-8(a). The trial judge agreed with defense counsel's argument and denied plaintiff's motion.

## II

Against this record, plaintiff now argues the trial court erred in denying his motion to preclude the jury from deciding whether plaintiff proved, by a preponderance of the evidence, that he sustained a permanent injury proximately related to the June 2, 2008 accident. Stated differently, relying on the Supreme Court's holding in Gilhooley v. County of Union, 164 N.J. 533 (2000), plaintiff argues the orthopedic hardware implanted by Dr. Abrams to surgically repair the injury to his left shoulder constituted sufficient evidence to satisfy, as a matter of law, the "permanent injury" threshold under N.J.S.A. 39:6A-8(a).

In response, NJM argues the evidence presented to the jury was not so one-sided that it precluded a reasonable juror from finding the injuries plaintiff sustained, proximately related to the June 2008 accident, have sufficiently healed to enable him to regain his normal function. NJM also notes that plaintiff's own testimony conflicted at times, creating a clear issue of

16                                                      A-3230-13T4

credibility for the jury. Finally, NJM emphasizes that plaintiff's reliance on Gilhooley is misplaced because the Court in that case addressed the plaintiff's injury in the context of the Tort Claims Act (TCA), N.J.S.A. 59:1-1 to 59:12-3, not AICRA.

The record here is replete with evidence from which a rational jury could find plaintiff did not present sufficient evidence to satisfy his statutory burden. Under N.J.S.A. 39:6A-8(a), "[a]n injury shall be considered permanent when the body part or organ, or both, has not healed to function normally and will not heal to function normally with further medical treatment." Although plaintiff did not discuss or even cite the relevant standard of review, the question before us is governed by Rule 4:40-1, which provides:

> A motion for judgment, stating specifically the grounds therefor, may be made by a party either at the close of all the evidence or at the close of the evidence offered by an opponent. If the motion is made prior to the close of all the evidence and is denied, the moving party may then offer evidence without having reserved the right to do so. A motion for judgment which is denied is not a waiver of trial by jury even if all parties to the action have so moved.

In reviewing a trial court's decision on a motion for a directed verdict, this court "appl[ies] the same standard that governs the trial courts." Frugis v. Bracigliano, 177 N.J. 250,

269 (2003). The standard for a motion made pursuant to <u>Rule</u> 4:40-1 is akin to the standard applicable to a motion for summary judgment under <u>Rule</u> 4:46-2(c). We must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Ibid.</u> (quoting <u>Brill v. Guardian Life Ins. Co. of Am.</u>, 142 <u>N.J.</u> 520, 540 (1995)).

Indeed, "[a] motion for a directed verdict, made pursuant to [<u>Rule</u>] 4:40-1 . . . 'shall be denied if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in [the non-movant]'s favor.'" <u>Edwards v. Walsh</u>, 397 <u>N.J. Super.</u> 567, 571 (App. Div. 2007) (quoting <u>R.</u> 4:37-2(b)). Otherwise, where "the evidence and uncontradicted testimony is 'so plain and complete that disbelief of the story could not reasonably arise in the rational process of an ordinarily intelligent mind, then a question has been presented for the court to decide and not the jury.'" <u>Fruqis</u>, <u>supra</u>, 177 <u>N.J.</u> at 270 (quoting <u>Ferdinand v. Agric. Ins. Co.</u>, 22 <u>N.J.</u> 482, 494 (1956)).

Here, the trial judge made the following findings in support of his decision to deny plaintiff's motion:

> In deciding this motion naturally the Court has to give all inferences in favor of

the non-moving party in this case, the defendant.  Plaintiff contends that Dr. Abrams clearly testified that as the result of the labral tear which was repaired by the arthroscopic surgery in 2010 that there is going to be and will be into the future pain caused by this repair of the tear, caused by the injury that was caused by this accident continuing into the future.

However, Dr. Decter -- it is not the defendant's burden to prove by a preponderance of the evidence that there was not an injury and that's what plaintiff is asking.  The defense expert, Dr. Decter, clearly testified that in his opinion Dr. Abrams did a superlative job, I don't know if that's the word he used, but he was excellent, he would use Dr. Abrams to repair his own shoulder.

He was effusive in his [praise] and what he also said was he completely -- he completely healed, that the body part in question now functions normally and he doesn't have to use those words, but his testimony was he has full range of motion, he has strength, his [sic] has suppleness, he has all of these various degrees of standards to determine whether or not the left shoulder has been restored to function normally and it -- that's the standard and I find that he has presented sufficient testimony and credible medical evidence based upon his analysis of the credible medical evidence relied upon by plaintiff's expert to render that opinion.

I find that [permanency] is a matter of fact that has to be determined by the jury and the motion is denied.

[(Emphasis added).]

In cases where the question of permanency under N.J.S.A. 39:6A-8(a) is hotly contested, such as it was in this case, the jury, acting within its fact-finding role, must determine whether plaintiff has satisfied his statutory burden by a preponderance of the evidence. Ames v. Gopal, 404 N.J. Super. 82, 85-86 (App. Div. 2008), certif. denied, 198 N.J. 316 (2009). Here, the trial judge's analysis and ultimate conclusion is amply supported by the evidence presented at trial and properly applied the statutory standard established by the Legislature in AICRA.

Plaintiff next argues the fact it took the jury approximately twenty minutes to reach a unanimous verdict finding plaintiff did not prove, by a preponderance of the evidence, he sustained a permanent injury that is proximately related to the June 2, 2008 accident constitutes a per se miscarriage of justice. Plaintiff's appellate brief devotes a total of two and one half pages to this argument. A half of one page contains a verbatim recitation of the Model Civil Jury Charge, through which a trial judge admonishes jurors to decide the case impartially and not permit "sympathy, passion, bias, or prejudice," to influence their decision. Model Jury Charge (Civil), 1.12P, "No Prejudice, Passion, Bias or Sympathy" (2007). Plaintiff does not cite any legal authority to support

the extraordinary relief he seeks from this court. Plaintiff merely equates the brevity of the deliberations with a miscarriage of justice. Under these circumstances, plaintiff's argument lacks sufficient merit to warrant any further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Finally, plaintiff argues the trial judge committed reversible error when he failed to give a proper curative instruction to the jury in response to a remark made by defense counsel in the course of her opening statement to the jury. Plaintiff's counsel devoted a total of one and a quarter pages in his appellate brief to this argument. Here again, plaintiff's counsel did not cite any legal authority in support of his client's legal position on appeal. Although this argument is completely devoid of merit, we will nevertheless address it in some detail because it is predicated on an alleged misstatement of law or fact by defense counsel, compounded by an alleged erroneous or inadequate response by the trial judge.

When defense counsel addressed the jury for the first time in her opening statement, she introduced herself as follows:

> I represent the defendant, Mr. Earl Smith, who is here with us today. As you've just heard, in this case you're not going to have to determine who was at fault for an accident that happened now on June 2nd, 2008. Mr. Smith has taken responsibility for that accident, but your task this week

> is going to be no less difficult than if you had to have the full case in front of you.
>
> In this case . . . plaintiff must prove to your satisfaction as reasonable people, and by a preponderance of the evidence . . . that the June 2nd, 2008 accident and that accident alone, not past life experiences, not subsequent life experiences, but that accident alone cause Mr. Sackman to suffer a permanent injury. . . ."
>
> [(Emphasis added).]

At the conclusion of defense counsel's opening statement, plaintiff's counsel requested to be heard outside the presence of the jury. At this N.J.R.E. 104 hearing, plaintiff's counsel argued that since this suit was an UIM claim against NJM, it was improper and misleading for defense counsel to refer to the tortfeasor as "defendant." To cure this mischaracterization, plaintiff's counsel requested the trial judge give the jury a

> curative instruction that Mr. Smith's personal assets are not in play at all, and quite frankly I think it requires instruction to the jury there's sufficient insurance coverage in this matter.
>
> I know I'm not allowed to mention NJM and I'm not allowed to mention insurance coverage and I did not. I constantly referred to the defense or defendant in this case. And quite frankly, I'm not even so sure it's appropriate for Mr. Smith to be constantly referred to as the defendant when he is not the defendant in this case and there is no actually pending law suit or pending action against him as a named defendant.

[(Emphasis added).]

The trial judge denied plaintiff's application and instead instructed the jury as follows:

> Your only function in this case is to determine, number one, whether the injuries reached a level where the plaintiff is entitled to sue for damages and if so, based upon the evidence and jury instruction I give you on damages at the conclusion of the case, what amount of damages would compensate the plaintiff for his injuries.

Plaintiff argues the judge's rejection of his trial counsel's proposed curative instruction constituted reversible error. Specifically, plaintiff's appellate counsel states in the brief before us: "When one combines this element of the trial with the fact that the jury rendered a no cause verdict on the threshold in only twenty-one minutes, one must seriously question the validity of the jury's verdict." Here again plaintiff's appellate counsel did not cite any legal authority to support this position.

Had plaintiff's appellate counsel taken the time and effort to conduct even a modicum of research of this legal issue, he would have discovered our Supreme Court addressed this precise contentious question in Bardis v. First Trenton Ins. Co., 199 N.J. 265 (2009), an opinion released by the Court five years before the start of this trial. As framed by Justice Hoens on

A-3230-13T4

behalf of a majority of the Court in <u>Bardis</u>, "[W]e are called upon to answer . . . whether, in a jury trial arising out of Underinsured Motorist (UIM) coverage, the insurer should be identified as the defendant."[5]  <u>Id.</u> at 269.  Citing with approval our holding in <u>Krohn v. New Jersey Full Ins. Underwriters Ass'n</u>, 316 <u>N.J. Super.</u> 477, 483 (App. Div. 1998), <u>certif. denied</u>, 158 <u>N.J.</u> 74 (1999), the <u>Bardis</u> Court emphasized that "[a] UIM action is essentially a contract-based substitute for a tort action against the tortfeasor."  <u>Bardis</u>, <u>supra</u>, 199 <u>N.J.</u> at 279.  The Court nevertheless rejected

> the request for a rule compelling the insurer in a UIM trial to be identified as the defendant . . . .  Instead, in the context of a UIM trial, in which the circumstances of the underlying accident are the focus, we are persuaded that the insurer's identity is ordinarily irrelevant. Nonetheless, we leave it to the sound discretion of the trial judge to conclude, and to act accordingly, if circumstances in a particular trial suggest otherwise.
>
> [<u>Id.</u> at 277.]

We acknowledge that reasonable minds can differ on this question.  Indeed, in <u>Bardis</u>, Justice Albin wrote a passionate and compelling concurrence expressing his belief

> that the jury can handle the truth, that the jury can be trusted to be fair to the true

---

[5] The <u>Bardis</u> Court also addressed two other issues that are not relevant to this discussion.

> parties in interest, and that feeding fictions to the jury is an unacceptable way to run a transparent court system. I also believe that a properly instructed jury--even in an insurance coverage case--is capable of rendering a fair verdict. In courtrooms throughout this State, juries hear sensational cases widely reported in the press, sometimes involving notorious defendants or plaintiffs, but we have faith that carefully selected jurors given proper legal guidance will do justice. I see no reason to depart from that paradigm for an insurance company in a UIM coverage case.
>
> [Id. at 282-83 (Albin, J., concurring).]

### III

We cannot, in good conscience, conclude this opinion without finding that the brief submitted by plaintiff's counsel in this appeal warrants the imposition of monetary sanctions pursuant to Rule 2:9-9. Because we are keenly aware of the extraordinary nature of this action, we want to clearly explain the reasons underpinning our decision. Our reproach is not based on counsel's failure to adhere to the format requirements delineated in Rule 2:6-2. Plaintiff's appellate brief was neatly printed and the point headings clearly identified the legal issues raised therein. Furthermore, although we have rejected plaintiff's arguments, we do not claim plaintiff's counsel raised frivolous arguments, completely lacking any reasonable basis in law or equity.

The attorney's failings here are not based on the type of conduct proscribed pursuant to Rule 1:4-8(a) and N.J.S.A. 2A:15-59.1 as "frivolous litigation."  As our colleague Judge Lyons made clear in Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn, 410 N.J. Super. 510, 545 (App. Div. 2009), certif. denied, 203 N.J. 93 (2010), while "Rule 1:4-8 has a punitive purpose in seeking to deter frivolous litigation, it also seeks to compensate a party that has been victimized by another party bringing frivolous litigation."  (Citing Deutch & Shur, P.C. v. Roth, 284 N.J. Super. 133, 141 (Law Div. 1995)).  By contrast, a sanction imposed under Rule 2:9-9 is intended to deter the improper prosecution or defense of an appeal and prevent the misuse of judicial resources that result from such derelictions. In re Tenure Hearing of Cowan, 224 N.J. Super. 737, 752-53 (App. Div. 1988), Judge Brody explained how an attorney's failure to adhere to Rule 2:6-2(a)(4) (which requires an appellant's brief to include "[a] concise statement of the facts material to the issues on appeal supported by references to the appendix and transcript") profoundly undermined the court's ability to comprehend the material facts in the case.

> The limitation on the number of pages in a brief has a wholesome purpose.  It requires the brief writer to recount the facts and to argue the law with economy.  That constraint is designed to produce a brief that is well-

> organized, thoughtful, comprehensible and to the point.
>
> . . . .
>
> Appellant's expansiveness infected the legal arguments in his brief with similar unproductive results. Over 20 pages are devoted to single-spaced extensive quotations from published opinions and from the record. At one point two opinions are quoted in three and a half continuous pages without regard to the relevancy of the quoted material.
>
> [<u>Id.</u> at 752-53.]

Here, the brief submitted by plaintiff's counsel must be censured and sanctioned because it displayed an utter indifference to the standards of professional competence a tribunal is entitled to expect from an attorney admitted to practice law in this State. Even a cursory review of plaintiff's appellate brief reveals a complete lack of any effort by counsel to cite and discuss, in a professionally reasonable manner, relevant legal authority in support of the three arguments raised therein.

The first argument in plaintiff's appellate brief states the trial court erred in denying plaintiff's motion to preclude the jury from considering the question of permanency. We have stated the reasons for rejecting this argument in Part II of this opinion. However, it bears repeating that plaintiff's brief cited only <u>Gilhooley v. County of Union</u>, <u>supra</u>, as support

for this argument. The brief did not discuss or even identify the relevant standard we must apply in reviewing the trial judge's decision, nor did it include an analysis of how the Court's reasoning in Gilhooley applied to the facts of this case, or to the verbal threshold requirements in AICRA.

Plaintiff's second argument sought to overturn the jury's verdict. Counsel again failed to cite any legal authority in support of this argument; he did not articulate the relevant standard of review, or identify the specific incidents of impropriety that irreparably tainted the jury's verdict. The only legal reference included as support for vacating the jury's verdict consisted of a verbatim recitation of the standard model jury charge the trial judge gave the jury describing its obligation to decide the case without bias or prejudice.

Plaintiff's third and final argument point sought the reversal of the jury verdict based on defense counsel's alleged misrepresentation in her opening statement before the jury. As part of this argument, plaintiff's counsel also questioned the efficacy of the trial judge's response to the alleged misstatement by defense counsel. Plaintiff's counsel did not cite any legal authority to support this argument. Counsel's unsupported assertions covered a total of one and one quarter pages.

28 A-3230-13T4

Thirty-nine years ago, this court repudiated the same type of shoddy, unprofessional submission, and in the process endorsed the following standards of professionalism that must be followed in the presentation of legal analysis in appellate briefs:

> Despite the fact that independent research by the court is, to a greater or lesser extent, the invariable rule, the parties may not escape their initial obligation to justify their positions by specific reference to legal authority. Paucity of such reference suggests a like paucity of authority helpful to the party. <u>The absence of any reference to the law, as here, suggests as well a regrettable and reprehensible indifference on the part of the brief writer not only to the rules but to the interest of the client as well</u>.
>
> [<u>State v. Hild</u>, 148 <u>N.J. Super.</u> 294, 296 (App. Div. 1977). (Emphasis added).][6]

We now reaffirm our commitment to the enforcement of the professional standards our colleagues expressed in <u>Hild</u>. Lawyers who take on the responsibility to represent clients

---

[6] We emphasize that at the time our colleagues endorsed this standard of professional responsibility, legal research was performed by the attorney through a labor-intensive process that often consumed hours of an attorney's time. It required personally reviewing the various legal digests to identify a line of possibly relevant cases. If a case seemed relevant, the attorney had to examine the Shepard's volumes, one by one, to ensure the case had not been reversed or distinguished in a manner adverse to the legal argument at issue. Today, far more comprehensive research can be completed in a matter of minutes.

before this court are expected to: (1) familiarize themselves with the record developed in the forum of origin; (2) research and analyze the competent legal authority related to the salient facts of the case; and (3) submit briefs in support of the arguments identified therein which reflect that the lawyers conducted these tasks in a diligent and professional manner. This is the kind of effort a tribunal in this State is entitled to expect from an attorney admitted to practice in this State. Most importantly, as we noted in Hild, this is the kind of professional effort an attorney owes to his or her client. Ibid.

As appellate judges, we review hundreds of briefs every year.[7] The quality of the legal analysis presented to us varies in every case from excellent to poor. However, a large percentage of the briefs we review fall within the middle to upper range of this spectrum. We accept this as an unavoidable aspect of any human endeavor, knowing that facility of expression, advocacy skills, and intellectual abilities are not equally distributed. What we cannot accept, however, is a lack

---

[7] As reported by the Administrative Office of the Courts, "[t]he Appellate Division decides approximately 6,500 appeals and 10,000 motions each year." New Jersey Courts, http://www.judiciary.state.nj.us/appdiv/index.html (last visited Apr. 18, 2016).

of effort.  That is what occurred here.  That is the basis for our decision to sanction plaintiff's appellate counsel.

Plaintiff's appellate counsel failed to conduct even a modicum of legal research or attempt to present any reasonably competent analysis of the law as it related to the facts of this case.  By submitting a shoddy, professionally unacceptable brief, plaintiff's appellate counsel displayed a disrespect for the work of this court and for the legal profession itself.  The indifference to the fundamental tenets of the legal profession displayed here by plaintiff's appellate counsel warrants the imposition of a monetary sanction under Rule 2:9-9.

Rule 2:9-9 authorizes this court to impose sanctions against an attorney who fails "properly to prosecute or defend an appeal."  These sanctions may include, but are not limited to, dismissal of the appeal, "imposition of costs or attorney's fees[,] or such other penalty as may be assessed personally against the attorney."  In this respect, our Supreme Court has admonished that "if it is at all possible, the litigant should not be burdened with his attorney's derelictions."  Paxton v. Misiuk, 34 N.J. 453, 458 (1961).

Plaintiff's appellate counsel is ordered to issue a check from the firm's business account payable to the Treasurer of the State of New Jersey in the sum of $200.  The check shall be

remitted to the Clerk of the Superior Court, Appellate Division within ten calendar days of the release of this opinion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

**GILSON, J.S.C. (temporarily assigned) concurring.**

I concur in the well-reasoned opinion of the court, except for section III. I agree with my colleagues in encouraging professional standards of advocacy. Attorneys should strive to make reasoned arguments based on the facts and law and should candidly cite supporting or opposing precedent. I write separately because I believe a monetary sanction is not warranted here. Admittedly, plaintiffs' appellate counsel could have done more, but I do not find their brief so lacking in thought and preparation as to manifest a disrespect to professional standards. I take this position because I believe that sanctions should be reserved for appropriate limited situations. In my opinion, this is not such a situation.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION