**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4426-18

KATHLEEN TRELA and
CHRISTOPHER TRELA,

  Plaintiffs-Appellants,

v.

DARREN ROSE, MEINEKE
CAR CARE CENTER,

  Defendants-Respondents,

and

THE ESTATE OF KRISTI
SEEGER,

  Defendant.

_____

> Argued September 23, 2020 – Decided August 13, 2021
>
> Before Judges Fuentes, Whipple and Rose.
>
> On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-0324-16.
>
> Michael Confusione argued the cause for appellant (Hegge & Confusione, LLC and The Maglione Firm

PC, attorneys; Michael Confusione and Dean R. Maglione, on the brief).

Richard J. Mirra argued the cause for respondents (Hoagland, Longo, Moran, Dunst & Doukas, LLP, attorneys; Richard J. Mirra, of counsel and on the brief).

PER CURIAM

On July 16, 2014, plaintiff Kathleen Trela was involved in a motor vehicle accident when defendant Darren Rose rear-ended her car as she turned left to enter her driveway. At the time of the accident, Rose was employed by Meineke Car Care Center (Meineke) and was test driving a 2006 Mazda 5 owned by Kristi Seeger. Plaintiff's automobile policy contained a "verbal threshold" provision under N.J.S.A. 39:6A-8(a), that limits her right to recover monetary damages only if she suffers permanent injuries. Defendants conceded liability,[1] but denied the accident was a proximate cause of plaintiff's alleged permanent injuries.

On January 7, 2015, plaintiff filed a civil action against defendants Rose, Meineke, and Seeger alleging common law negligence, and negligent supervision by Meineke based on Rose's status as its employee.

---

[1] Rose admitted he was speeding at the time of the accident and pled guilty in the Woodbridge Park Municipal Court to careless driving. N.J.S.A. 39:4-97.

A-4426-18

Plaintiff amended her complaint thereafter multiple times. The third and final amended complaint, filed on November 29, 2016, added a per quod claim by plaintiff's husband Christopher Trela.[2] Kristi Seeger died sometime after plaintiff filed her third amended complaint. On January 7, 2019, plaintiff executed a stipulation of dismissal with prejudice as to all claims against the Estate of Seeger.

After nearly three years of discovery, the case came to trial before a jury on May 14, 2019, limited to the issue of damages. Rose conceded he negligently drove the Mazda 5 that rear-ended plaintiff's car; Meineke conceded it was vicariously liable for Rose's negligence based on the doctrine of respondeat superior.[3] The jury returned a verdict in favor of defendants in which it found: (1) plaintiff did not prove, by a preponderance of the objective credible medical evidence, that she sustained a permanent injury proximately caused by the July

---

[2] Because Christopher Trela's per quod claim for damages is derived from his status as Kathleen Trela's spouse, we will refer to claims sought by both of them using "plaintiff" in the singular.

[3] "For liability to attach to an employer under the doctrine of respondeat superior, the plaintiff must prove the existence of an employer-employee relationship and that the employee's tortious actions 'occurred within the scope of that employment.'" G.A.-H. v. K.G.G., 238 N.J. 401, 415 (2019) (quoting Carter v. Reynolds, 175 N.J. 402, 409 (2003)).

16, 2014, accident; and (2) plaintiff was not entitled to any monetary damages "for past and future lost wages and benefits."

In this appeal, plaintiff argues the trial judge erred when he denied her motion for a directed verdict pursuant to Rule 4:40-1. Alternatively, plaintiff argues the judge should have granted her request to permit the jury to consider her scars as evidence to satisfy the "permanent injury" requirement in N.J.S.A. 39:6A-8(a). Finally, plaintiff claims she was denied a fair trial when the judge misapplied N.J.R.E. 703 to limit the testimony of her orthopedic surgeon. Defendants argue the trial judge managed the proceedings in accordance with the relevant statutory standard and urge us not to disturb the jury's verdict finding plaintiff is not entitled to any monetary damages.

After reviewing the record developed at trial, we discern no legal basis to disturb the jury's verdict. We will summarize the evidence the parties presented to the jury before we address plaintiff's arguments.

I.

The accident occurred on July 16, 2014. Defendant Rose was driving a 2006 Mazda 5 owned by the late Kristi Seeger in his capacity as an employee of Meineke. Rose was driving the Mazda behind plaintiff's car when she turned into her driveway. Rose was unable to stop and negligently rear-ended plaintiff's

A-4426-18

car. These facts are undisputed. Woodbridge Park Police Officer Diorca Hernandez responded to the scene of the accident and wrote a police report to memorialize what occurred. In his trial testimony on May 14, 2019, Officer Hernandez relied on the police report to refresh his recollection[4] about what he observed nearly five years earlier.

> I observed vehicle one had damages to the left corner of the rear bumper. Driver two had damages to the right corner of the front bumper. The damages found in both vehicles are consistent with each other. As a result of this collision, driver one had complain[ed] of shoulder and arm pain.

Officer Hernandez noted that plaintiff was driving a black Ford. Rose told Officer Hernandez "that he was speeding on Highland Road when suddenly [plaintiff's car] made a left into her driveway, subsequently resulting in the collision[.]" Rose was not injured. Following police protocol, Officer Hernandez summoned an ambulance to the scene. Plaintiff testified that the medical staff who responded to the scene of the accident checked her vital signs and blood pressure and told her she was fine. Her husband drove her to the JFK Medical Center later that day because her "whole left arm went numb and it was

---

[4] See N.J.R.E. 612.

A-4426-18

hanging." Plaintiff did not reveal what treatment, if any, she received at the JFK Medical Center.

Plaintiff's first consultation with orthopedic surgeon Dr. Steven Nehmer occurred on July 23, 2014, one week after the accident. However, as the following exchange shows, plaintiff was unable to remember the date of her first consultation with Dr. Nehmer, or any other medically-related events that follow without referring to "a list of medical treatment schedules" she compiled in anticipation of her testimony at trial.

Q. What date did you go to Dr. Nehmer's?

A. I can't tell you the exact date.

Q. Is there anything I could give you to refresh your recollection as to the date you first went and saw Dr. Nehmer?

A. Yes.

Q. What is it that I could give you to help you remember?

A. The list of medical treatment schedules.

Q. What is this list of medical treatment schedules that you're talking about?

A. Something I went through with every medical record that I had -- that we had and accumulated from the treatment.

A-4426-18

Q. Okay. And why did you make this list?

A. It showed every course of action that I went through.

Q. Okay. And why did you want the course of action on a list?

A. So that I couldn't have any discrepancies.

Q. Okay. Fair enough. And how long did it take you to make this list?

A. Like two or three days.

This prompted an immediate objection from defense counsel and a subsequent lengthy sidebar discussion about hearsay evidence and treatments provided by physicians for medical problems unrelated to this accident. Equally disconcerting from the perspective of this appellate court, there are significant inaudible gaps in the transcription of these discussions which make the sidebar colloquy between the attorneys and the trial judge difficult, if not impossible to follow:

PLAINTIFF'S COUNSEL: All right. Are you suggesting that the list is incorrect? You want to sit a half hour and cross-reference it (inaudible) –

DEFENSE COUNSEL: (Inaudible)

PLAINTIFF'S COUNSEL: If there's any discrepancy, I'll be more than happy to amend them.

DEFENSE COUNSEL: I believe (inaudible)

(Inaudible discussion continues)

THE COURT: We had a conversation in chambers about (inaudible). (Inaudible).

PLAINTIFF'S COUNSEL: Judge, I guess the argument is (inaudible). She's going to say who she treated with, the time period she treated with them, and what they treated her for. That's very simple. (Inaudible discussion continues).

DEFENSE COUNSEL: So the identification of these providers is not something that's (inaudible). But I just know what the record says.

(Inaudible discussion continues)

[(Emphasis added).]

The irony in this statement is the only thing that is clear from the record.

Based on this incomprehensible discussion, plaintiff's counsel provided his client with the following instructions:

You are only permitted -- I'm not going to ask any questions, when you get to Dr. Ryan, what he treated you for. We're not going to talk about any treatment, what they did for you, anything like that. We're just going to give the jurors the dates, other than two doctors we're going to talk about. So will you just –

A. And I can't say what kind of doctors they are?

Q. No.

A. Okay.

. . . .

> PLAINTIFF'S COUNSEL: That's my -- that's my understanding of the ruling, Judge. She will not even say what type of doctor they are? Or will she able to say it's an orthopedic doctor, it's a –
>
> THE COURT: The witness will be permitted to identify who she saw and the dates and that's it.
>
> PLAINTIFF'S COUNSEL: Not the type of doctor.
>
> THE COURT: Other than Dr. Nehmer and Dr. Hunt.
>
> PLAINTIFF'S COUNSEL: Okay. Perfect. Thank you, Judge. Thank you for the clarification.

Dr. Nehmer testified that the first time he saw plaintiff was on July 23, 2014. He described her as a forty-three-year-old woman who complained "of pains [in] her neck, left shoulder and low back . . . the neck pains traveled to her left arm with numbness and tingling." She claimed that she never experienced any problems with her neck, back or left arm before the automobile accident. Dr. Nehmer testified that his "impression was that she had multiple sprains" and was going to try "to get the x-rays reports from JFK Medical Center rather than repeating them." Until then, he advised her to begin physical therapy.

Plaintiff had a second consultation with Dr. Nehmer a few weeks later complaining of pain in her shoulder. He told her to continue the physical therapy

9

and suggested that she have a magnetic resonance imaging (MRI) scan. Plaintiff returned on September 12, 2014, complaining of multiple areas of discomfort, but her main problem was still her left shoulder. Dr. Nehmer told her to consult a pain management physician if her pain continued.

Dr. Nehmer testified that the first time he raised the option of a surgical approach with plaintiff was on February 5, 2015, because "[a]t that point, it was more than six months that she'd been having a problem." He told her that the therapy did not appear to be alleviating her pain and discussed a potential surgery on her left shoulder. On March 3, 2015, Dr. Nehmer "brought her to the operating room . . . at the Center for Ambulatory Surgery" and diagnosed plaintiff's left shoulder "with something called impingement syndrome."

> What that means is the shoulder -- the top of the arm bone, it's like a ball, and there's a bone above it called the end of your collarbone and your acromion. Now, when you lift your arm up, there has to be enough space for it to come up. In between those two bones is your rotator cuff tendon and also a bursa on top of it. And if those swell up, if they get injured, when you lift, there's not enough room. And that's what we call nowadays impingement syndrome.
>
> So that's what she had. And I did surgery for it. What I did was I removed the bursa that, you know, lead. That gives some space. The top bone, that acromion, I removed the front half of it in order to give more space for everything. The part of the end of her clavicle was removed as well.

> The next day, I removed her bandages, and a couple weeks later, her stitches that she had from the surgery. And I recommended that she have physical therapy.

On April 1, 2015, nearly a year after the accident, but less than a month after the shoulder surgery, plaintiff returned to Dr. Nehmer complaining of pain in her left elbow. He diagnosed plaintiff as suffering from lateral epicondylitis, also known as "tennis elbow." This is associated with a process that occurs over time due to repeated movement or overuse. Dr. Nehmer again opted for a surgical approach. He performed surgery on plaintiff's left elbow on February 2, 2016.

According Dr. Nehmer, two months of physical therapy is consistent with the type of surgery performed. Plaintiff had physical therapy from February 18, 2016 through April 2016, and was discharged from Dr. Nehmer's care that same month. Plaintiff continued to have physical therapy for the left elbow at Edison Metuchen Orthopedics from May 2, 2016, to September 2, 2016. Dr. Nehmer testified that continued treatment for the elbow after September 2016 was not indicated.

The elbow surgery performed by Dr. Nehmer required stitches to close the surgical incision. Plaintiff's friend Maria Tejas identified two photographs of plaintiff's elbow taken shortly after the surgery was performed on February 2,

11

2016, which depict the surgical stitches. The photographs were admitted into evidence without objection. On cross-examination, Tejas testified that the scars depicted in the photographs are still there, but "[t]hey're not as noticeable. You can't see the stitches."

On June 1, 2017, Dr. Nehmer issued an expert report with the following "final diagnoses": (1) cervical strain with a bulging C5-C6 disc; (2) left shoulder posttraumatic impingement syndrome; (3) left cubital tunnel syndrome; (4) left elbow lateral epicondylitis (tennis elbow); (5) left hand carpal tunnel syndrome; (6) lumbar strain; (7) right hip derangement; (8) right sacroiliitis; (9) right piriformis syndrome. He confirmed these diagnoses on cross-examination by defense counsel. In an addendum filed on June 7, 2017, Dr. Nehmer noted that plaintiff received a cortisone injection to remediate her right hip trochanteric bursitis. The diagnoses in Dr. Nehmer's June 1, 2017, report remained unchanged.

In a September 27, 2018, report Dr. Nehmer noted that plaintiff complained of pain and numbness in her hand. He recommended surgery to plaintiff's left wrist for carpal tunnel syndrome. On cross-examination, he conceded that carpal tunnel is a degenerative injury that can develop over the

12

course of time. Plaintiff declined Dr. Nehmer's recommendation to alleviate the symptoms of carpal tunnel through surgery.

Dr. Stephen Hunt is also an orthopedic surgeon and testified as an expert witness for plaintiff in the field of orthopedic injuries.[5] He first saw plaintiff on November 3, 2017, nearly three and a half years after the accident. Dr. Hunt administered a hip injection in December 2017 and performed arthroscopic surgery on to plaintiff's right hip on September 6, 2018. Dr. Hunt opined the hip surgery was "causally related to the crash." When asked to state his opinion on plaintiff's prognosis regarding her hip, within reasonable degree of medical certainty, he responded:

> So currently she's still doing very well but she is still early in her recovery phase. We see people plateau about a year out from this surgical procedure. The general outcome study suggests that, you know, most people maintain a pretty high quality of lifestyle for a period of time; meaning around seven to ten years, but there is risk of deterioration in the form of arthritis or pain generation, stiffness, and things like that that can percept in some patient modulations.

---

[5] Dr. Hunt's testimony was presented to the jury in a de bene esse deposition which was taken by the parties for potential use at trial. This form of testimony is not part of the trial itself until it is used. Mellwig v. Kebalo, 264 N.J. Super. 168, 171 (App. Div. 1993); see also R. 4:14-9.

A-4426-18

Dr. Hunt last saw plaintiff in March of 2019. He testified that she "expressed satisfaction with the procedure and that she seemed to have significant improvement from it." She "no longer had that significant pain and . . . was building up strength." Dr. Hunt acknowledged that there was a risk of deterioration in the form of arthritis and stiffness which increased the risk of future surgical intervention. However, Dr. Hunt made clear on cross examination that, in his opinion, plaintiff made a full recovery from the hip condition.

Counsel asked Dr. Hunt whether plaintiff had "sacroiliitis," which he defined as "an inflammation of the sacroiliac joint[,] which is where the lower spine meets the posterior pelvis joints." Dr. Hunt opined that it was possible she had "some degree of sacroiliitis . . . but . . . it may be secondary to these issues or it may be independent." However, although plaintiff had not recently complained of symptoms relating to sacroiliitis, he could not rule it out. Based on his notes, "it did appear that she was having major symptoms of that nature."

In his September 25, 2018, report, Dr. Hunt only expressed his opinions related to the condition of plaintiff's hip, and not her shoulder, elbow, or any other body part. On April 10, 2019, Dr. Hunt opined that plaintiff would "be able to resume an active lifestyle and pain-free daily life." This prognosis

pertained only to plaintiff's hip condition. It did not include any prediction of her ability to function with her shoulder and elbow injuries.

Against the backdrop of this medical testimony, plaintiff's attorney asked plaintiff "what parts of your body are different now than it was before that crash?" She explained that since the accident, she has reduced strength and mobility in her right leg and shoulder. She estimated that she has seventy percent mobility in her left shoulder and no sensation in her left forearm. She is still recovering from her hip surgery; this affected her entire right leg. She testified that her current physical condition causes her to struggle with everyday tasks, such as carrying a laundry basket in her home.

Plaintiff testified she is unable to perform her normal routines and hobbies due to the injuries she suffered since the accident. She is unable to walk her dogs early in the morning nor cook breakfast for her children before they go to school. Her social life has been significantly diminished and she no longer hosts parties. Plaintiff's daughter testified that before the accident

> my mom every day before I would wake up for school . . . would make me breakfast with potatoes, eggs, waffles, bacon, basically anything I wanted every day and I would smell it. I would wake up to it and she would always just do that for me every day.
>
> Q. What time would your mother have this breakfast prepared for you?

15

A. Like 7:00 in the morning.

Q. All right. Since the crash?

A. Now I don't get breakfast. I have to wake her up. I have to use my alarm clock to get both of us up for school[.]

A friend of the family testified that before the accident plaintiff had an active social life in her home. "We've become like family, including with my children and my wife. We were there often, parties, pool parties, Super Bowls." Since the accident, "we're really not there anymore. I don't recall the last time my family's been there. It's been years."

Plaintiff also presented the testimony psychiatrist Dr. Grigory S. Rasin, whom she first met three years after her motor vehicle accident. According to Dr. Rasin, plaintiff developed an anxiety disorder and depression related to the injuries she suffered in the motor vehicle accident. Her depression "affected her daily life [and] . . . her relationship with her husband. . . ." In response to defense counsel's questions, Dr. Rasin confirmed that plaintiff's counsel referred plaintiff to him for evaluation and that he placed her on a course of treatment that involved "psychotherapy and medication management." Dr. Rasin also acknowledged that part of his practice as a psychiatrist involves forensic work referred to him by personal injury attorneys. Dr. Rasin did not review plaintiff's

16

medical records; he based his assessment of plaintiff's psychiatric issues only on what she told him about the accident.

At this point, defense counsel read before the jury the first page of Dr. Rasin's June 15, 2017, report:

> On July 16, 2014, Ms. Trela was a restrained driver of a car which struck in the rear when she was driving at speed of between four and five miles per hour. <u>As a result of an impact, Ms. Trela struck her left shoulder against steering wheel. She had a bruise across her chest. She also injured her hip. Ms. Trela said, quote, "My arm became paralyzed. The ambulance arrived and they thought that I had a stroke</u>."
>
> She was brought to JFK University Hospital by her husband within an hour of her accident.
>
> . . . .
>
> Q. And that's the history of what she told you when you first met with her?
>
> A. That's correct, sir.
>
> Q. Okay. Now, the jury has heard from the investigating police officer who responded to the scene. Did she tell you that she refused medical attention at the scene of the accident?
>
> A. She didn't -- I cannot recall what she told me at that time. But it's obvious that her husband took her to a hospital within an hour.
>
> Q. Okay. I appreciate that response. But my question was, when you took this history from her, did she tell

A-4426-18

you that she refused medical attention at the scene of the accident?

A. I don't remember.  No.

Q. Do you have that noted in this initial report?

A. No.  It's not in my report.  No.

Q. Okay. And, in fact, she told you that my -- quote, "My arm became paralyzed at the scene of the accident"? That's what she told you?

A. Yes.  That's correct.

Q. And she told you that she thought she had a stroke? That's what she told you?

A. No.  That the people from EMS felt . . . that she might have a stroke.

Q. Okay.  So the ambulance squad thought she had a stroke, but she refused medical attention?

A. That's correct.

[(Emphasis added).]

## II.

Against these facts, plaintiff argues the trial judge erred in denying her motion for a directed verdict and submitting to the jury the question of whether she suffered a permanent injury within the meaning of N.J.S.A. 39:6A-8(a).  We disagree.  The standard for determining whether to grant a directed verdict at the

18

conclusion of the parties' presentation is codified in Rule 4:40-1, which provides:

> A motion for judgment, stating specifically the grounds therefor, may be made by a party either at the close of all the evidence or at the close of the evidence offered by an opponent. If the motion is made prior to the close of all the evidence and is denied, the moving party may then offer evidence without having reserved the right to do so. A motion for judgment which is denied is not a waiver of trial by jury even if all parties to the action have so moved.

We review a motion for a directed verdict by applying the same standard that governs the trial courts. Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016). A motion for a directed verdict shall be granted "only if, accepting as true all evidence supporting the party opposing the motion and according that party the benefit of all favorable inferences, reasonable minds could not differ." Edwards v. Walsh, 397 N.J. Super. 567, 571 (App. Div. 2007) (citing Dolson v. Anastasia, 55 N.J. 2, 5 (1969)). Conversely, a motion for a directed verdict "shall be denied if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in the non-movant's favor." Sackman v. New Jersey Mfrs. Ins. Co., 445 N.J. Super. 278, 291 (App. Div. 2016) (quoting Edwards, 397 N.J. Super. at 571).

A-4426-18

Applying this standard of review to the trial record we have described here at great length, we are satisfied there was no factual or legal basis to grant plaintiff a directed verdict as a matter of law. Furthermore, the record shows plaintiff's counsel did not move for a directed verdict at the end of the case. The record only shows that on the final day of trial, plaintiff's counsel requested the jury be charged on category three of the verbal threshold, which refers to "scarring or disfigurement." N.J.S.A. 39:6A-8(a). This prompted an immediate objection from defense counsel, who noted that "the jury was never shown her scars, never."

Citing Soto v. Scaringelli, 189 N.J. 558 (2007), defense counsel argued that this instruction to the jury was inappropriate and unsupported by the evidence. The trial judge accepted defense counsel's argument and rejected defense counsel's application to instruct the jury on this aspect of the verbal threshold statute. We agree.

The Supreme Court explained in DiProspero v. Penn the public policy underpinning the verbal threshold restrictions:

> The 1998 Automobile Insurance Cost Reduction Act (AICRA), N.J.S.A. 39:6A-1.1 to -35, provides automobile insurance policyholders with a choice: lower premium payments in exchange for limiting their right (and the right of those covered by the policy) to sue for noneconomic damages if injured in an accident.

20

That option, known as the "limitation on lawsuit" threshold, restricts an accident victim covered by the policy from suing a defendant for noneconomic damages unless she suffers "a bodily injury which results in death; dismemberment; significant disfigurement or significant scarring; displaced fractures; loss of a fetus; or a permanent injury within a reasonable degree of medical probability, other than scarring or disfigurement." N.J.S.A. 39:6A-8(a).

[183 N.J. 477, 480-81 (2005).]

In <u>Soto v. Scaringelli</u>, the Supreme Court specifically addressed the issue of scarring or disfigurement as a basis to overcome the verbal threshold restrictions in N.J.S.A. 39:6A-8(a):

In respect of the "significant disfigurement or significant scarring" statutory threshold applicable to a plaintiff's appearance, we hold that the threshold is satisfied only if an objectively reasonable person would regard the scar or disfigurement as substantially detracting from the automobile accident victim's appearance, or so impairing or injuring the beauty, symmetry, or appearance of a person as to render him or her unsightly, misshapen, or imperfect. Applying that standard, we also hold that the trial court properly concluded that injuries claimed did not satisfy the "significant disfigurement or significant scarring" statutory threshold. Finally, <u>we hold that, in the future and as a condition precedent to meaningful appellate review, a plaintiff who seeks to resist a defense based on that threshold bears the burden of establishing a proper record. That record must include the trial court's direct observations and description of the disfigurement or scarring alleged to be significant, together with an accurate photographic record thereof</u>.

21

[189 N.J. at 564 (emphasis added).]

Here, the only evidence plaintiff presented at trial to overcome this aspect of the verbal threshold limitations was the testimony of her friend Maria Tejas, who briefly commented on plaintiff's elbow surgery. Tejas also identified two photographs of plaintiff's elbow taken shortly after the surgery on February 2, 2016. These photographs depict the surgical stitches as they appear days after the surgery. However, when Tejas testified on May 14, 2019, she made clear that the stitches were then hardly noticeable. Under these circumstances, the photographs are not competent evidence under the standard established by the Court in Soto. In fact, the photographs are misleading and should have been excluded under N.J.R.E. 403 because their prejudicial effect far outweighed their probative value, if any.

Forty-four years ago, Chief Justice Hughes articulated the high level of respect a court must show when reviewing a jury's verdict:

> The judgment of the initial factfinder then, whether it be a jury, as here, or a judge as in a non-jury case is entitled to very considerable respect. It should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice.

[Baxter v. Fairmont Food Co., 74 N.J. 588, 597-98 (1977) (internal citations omitted).]

Mindful of these guiding principles, we discern no factual or legal basis to disturb the jury's verdict. Plaintiff's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4426-18